# EXHIBIT A

SUPERIOR COURT OF GWINNETTT COUNTY
STATE OF GEORGIA

ACME LENDING, LLC, AND
VISTA REALTY HOLDINGS, LLC,

      Plaintiffs,

v.

WACHOVIA DEVELOPMENT
CORPORATION, WACHOVIA BANK,
NATIONAL ASSOCIATION, and
WACHOVIA SECURITIES, LLC,

      Defendants

**08A-099003**

C. A. No. _____

_(stamp: FILED IN OFFICE, CLERK SUPERIOR COURT, GWINNETT COUNTY, GA, 2008 NOV -1 AM 10: 04, TOM LAWLER, CLERK)_

## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT, GEORGIA RICO VIOLATIONS, SECURITIES VIOLATIONS, AND OTHER RELIEF

NOW COMES Acme Lending, LLC (hereinafter **"Acme "**) and Vista Realty Holdings, LLC (hereinafter **"Vista"**), (also jointly referenced herein as **"Plaintiffs"**), and file this Complaint against Defendants Wachovia Development Corporation (hereinafter **"Defendant WDC"**), Wachovia Bank, National Association (hereinafter **"Defendant WBNA"**), and Wachovia Securities, LLC (hereinafter **"Defendant WS"**), (also jointly referenced herein as **"Defendants"**), and show as follows:

1.

Acme is a limited liability company duly registered in the State of Georgia.

2.

Vista is a limited liability company duly registered in the State of Georgia.

1

3.

Defendant WDC is a North Carolina corporation transacting business in the State of Georgia. Service may be perfected on this Defendant's registered agent: Prentice-Hall Corporation Systems, 40 Technology Parkway South #300, Norcross, Gwinnett County, Georgia 30092. Defendant WDC is thus subject to the jurisdiction of this Court, and venue is proper in this Court.

4.

Defendant WBNA is a North Carolina corporation transacting business in the State of Georgia. Service may be perfected on this Defendant's registered agent: Corporation Service Company, 40 Technology Parkway South #300, Norcross, Gwinnett County, Georgia 30092. Defendant WNBA is thus subject to the jurisdiction of this Court, and venue is proper in this Court.

5.

Defendant WS is a Delaware limited liability company transacting business in the State of Georgia. Service may be perfected on this Defendant's registered agent: Corporation Service Company, 40 Technology Parkway South #300, Norcross, Gwinnett County, Georgia 30092. Defendant WS is thus subject to the jurisdiction of this Court, and venue is proper in this Court.

6.

At all times relevant hereto, Defendant WDC, Defendant WNBA, and Defendant WS were co-conspirators in the tortious activities set out below. On information and belief, Plaintiff states that, after discovery, further facts will be added by amendment to show that Defendant WDC and Defendant WS were, at all times relevant hereto, the alter egos of Defendant WBNA and were used as the vehicle for improper and illegal activities that harmed Plaintiffs.

2

7.

In early 2006, Defendant WDC acquired an interest in a certain apartment complex in Fort Myers, Florida then known as Bay Harbor Apartments (hereinafter the **"Bay Harbor Project"**).

8.

At a date unknown at present to Plaintiffs, but well-known to Defendants, Defendants determined that their investment in the Bay Harbor Project needed to be liquidated.

9.

On or about May of 2007, representatives of Defendant WDC approached Vista in Atlanta, Georgia, and represented they were the real estate investment arm of Defendants WBNA and WS.

10.

The representatives of Defendant WDC further represented to Vista that they had the ability to enter into partnerships, joint ventures, and other speculative investments that Defendants WBNA and WS could not.

11.

The representatives of Defendant WDC further represented to Vista that they had access to the investment capital of Defendants WBNA and WS, and that Vista had been chosen for a continuing investment relationship on a multi-million dollar scale.

12.

Defendant WDC initially proposed a partnership wherein Defendants would make a capital contribution of Twenty Five Million Dollars ($25,000,000.00) to a company to be formed with Vista and known as Vista Realty Portfolio Investments, LLC (hereinafter the **"Company"**).

3

In return, Vista was to contribute certain developed and undeveloped properties in the Atlanta, Georgia area to the Company.

13.

Defendant WDC told Vista that Defendant WBNA was concerned about the level of the Defendants' investment in the Bay Harbor Project. Defendant WDC falsely represented that the Bay Harbor Project was a profitable investment that was easily marketable. A senior representative of Defendant WDC even represented to Vista that he was personally going to buy a participation interest in the Bay Harbor Project.

14.

Defendant WDC told Vista that a condition precedent to Defendants' investment with Vista was that Three Million Two Hundred Fifty Thousand Dollars ($3,250,000.00) of the funds contributed by Defendants to the Company be used to purchase an interest in the Bay Harbor Project known as the **"A-3 Participation Interest."**

15.

Defendant WDC represented to Vista that the purchase of the "A-3 Participation Interest" would benefit Defendants by reducing their investment in that single asset, and would benefit Vista because the aforesaid Interest would then be managed and marketed by Defendants for a profit.

16.

Vista reasonably relied on the representations of Defendant WDC as aforesaid because of the impending partnership. In further reliance on the aforesaid representations, Acme was formed for the purpose of purchasing the "A-3 Participation Interest."

4

17.

On or about July 27, 2007, Plaintiff Vista and Defendant WDC entered into a contract titled "LIMITED LIABILITY COMPANY AGREEMENT OF VISTA REALTY PORTFOLIO INVESTMENTS, LLC, (hereinafter the "**Agreement**"). A true and correct copy of the Agreement is attached hereto as **Exhibit "A."**

18.

In reliance on Defendant WDC's representations as aforesaid, Vista consented to have Three Million Two Hundred Thousand Dollars ($3,250,000.00) of the funds that Defendant WDC ostensibly invested in the Company wired, at Defendant WDC's direction, to an account on deposit with Defendant WBNA. A true and correct copy of the settlement statement funding the Company and showing said disbursement is attached hereto as **Exhibit "B."**

19.

On July 27, 2007, Defendant WDC prepared a document titled "**Participation Agreement**" that reflected Acme's purchase of the aforesaid "A-3 Participation Interest." A true and correct copy of that document is attached hereto as **Exhibit "C."**

20.

Immediately prior to the execution of the Agreement, the senior representative of Defendant WDC who had told Vista that, as proof of the worth of the Bay Harbor Project as an investment, he was going to personally buy a participation interest, advised Vista that Defendant WBNA's attorneys had told him that he could not make such a personal investment.

21.

Defendant WDC then proposed that another Three Million Dollars ($3,000,000.00) of the funds that Defendant WDC ostensibly invested in the Company be placed in a letter of credit and

5

pledged to Defendant WDC for the purchase of an interest in the Bay Harbor Project known as the "A-2 Participation Interest."

22.

Plaintiffs agreed to the aforesaid proposal based on Defendant WDC's representations that Defendants would use their managerial and entrepreneurial skills to aggressively market the aforesaid "A-2 Participation Interest," and that the aforesaid letter of credit would not be drawn against until said A-2 Participation Interest was sold.

23.

Defendant WDC's representations concerning the value and marketability of the Bay Harbor Project and Participation Interests therein were false when made, and known by Defendant WDC to be false when made.  In fact, the aforesaid Participation Interests were not marketable and are now worthless.

24.

Acme reasonably relied on the false representations of Defendant WDC in the purchase of the aforesaid Participation Interests, and suffered damages in the amount of its investment of Six Million Two Hundred Fifty Thousand Dollars ($6,250,000.00).

25.

Defendant WDC's representation that Acme's Three Million Dollar ($3,000,000) letter of credit would not be drawn against until the sale of the aforesaid "A-2 Participation Interest" was also false.  On July 24, 2008, Defendant WDC wrote to the issuer of the aforesaid letter of credit on the letterhead of Defendant WBNA and drew against the letter of credit by directing that the entire Three Million Dollars ($3,000,000.00) be wired to the account of Defendant WS.  A true and correct copy of the aforesaid correspondence is attached hereto as **Exhibit "D."**

6

26.

In reaching the Agreement, Vista selected, and Defendant WDC approved, several tracts of real estate in Fulton County Georgia that Vista would contribute as capital to the Company.

27.

One of the aforesaid tracts of real estate (hereinafter **"Lenox Vista"**), for reasons not relevant to this action, became unavailable for immediate contribution to the Company. After negotiation, Vista and Defendant WDC agreed that in lieu of contributing Lenox Vista to the Company, Vista would provide a letter of credit in the amount of One Million Five Hundred Thousand Dollars ($1,500,000.00) under certain terms and conditions (hereinafter the **"Letter of Credit"**).

28.

As a part of the consideration for executing the Agreement, Defendant WDC agreed that Vista had the right thereafter to substitute either Lenox Vista, or an equally acceptable tract of real estate for the Letter of Credit.

29.

On or about September 29, 2008, Vista notified Defendant WDC by letter that Lenox Vista was available for substitution, and requested that Lenox Vista be substituted for the Letter of Credit. A true and correct copy of that correspondence is attached hereto as **Exhibit "E."**

30.

On October 12, 2008, Defendant WDC responded to Vista's request for substitution. A true and correct copy of that response is attached hereto as **Exhibit "F."**

7

31.

Vista promptly and fully complied with all of the requirements specified by Defendant WDC in its October 12, 2008 response. Moreover, any changes in Lenox Vista since that project was approved by Defendant WDC as a part of the Company's portfolio have been for the better.

32.

Defendant WDC has failed and refused to accept Lenox Vista as substitute collateral for the Letter of Credit, and has failed and refused to release the Letter of Credit to Vista. These failures were unreasonable, in bad faith and were a breach of the Agreement. Moreover, these failures show that Defendant WDC never intended to allow the substitution of collateral, and that its promises to do so were false when made, thereby rendering the Agreement void because of this fraud in the inducement.

33.

One of the properties that Vista contributed to the Company was known as Lindberg Vista. This property was subject to a debt in favor of GE Real Estate that matured on November 30, 2008. The lender advised Vista that the loan would not be extended by electronic mail on October 16, 2008. A true and correct copy of that correspondence is attached hereto as **Exhibit "G."**

34.

On information and belief, Vista states that Defendant WBNA was faced with the possibility of receivership during the period from September 27 to 29, 2008, then was in confusion over which banking rival would acquire Defendant WBNA. On October 3, 2008, Defendant WBNA announced that it would be acquired by Wells Fargo & Co.

8

35.

Vista attempted without success to contact Defendant WDC regarding the rapidly approaching loan default and possible foreclosure of Lindberg Vista. A true and correct copy of said correspondence is attached hereto as **Exhibit "H."**

36.

On or about October 17, 2008, Vista executed a re-financing of Lindberg Vista. This action was necessary to preserve the asset in face of imminent default, and was taken because Defendant WDC refused to respond to urgent communications.

37.

The aforesaid refinancing was in the best interest of the Company and the proceeds of the new loan were used to pay off the loan to GE Real Estate. Vista has retained the excess proceeds of the loan in an account in the Company's name, and hereby offers to tender the sum of Four Million Four Hundred Ninety-Two Thousand Five Hundred Dollars ($4,492,500.00) into the registry of this Court.

38.

On November 5, 2008, counsel for Defendant WDC forwarded a letter to Vista threatening to declare the aforesaid refinancing of Lindberg Vista to be a default under the Agreement, and threatening to draw against the letter of credit that Defendant WDC is obligated to return as substitution of collateral, as set forth above. A true and correct copy of said letter from counsel for Defendant WDC is attached hereto as **Exhibit "I."**

9

## COUNT ONE -- DECLARATORY RELIEF

39.

The allegations of paragraphs 1 through 38 are incorporated herein by reference.

40.

The actions of Defendant WDC have called into question the validity of the Agreement, and have caused uncertainty and insecurity to Vista. An actual controversy exists between Vista and Defendant WDC with respect to Vista's relationship with Defendant WDC and with respect to Vista's rights and legal obligations under the Agreement.

41.

Vista requests that this Court issue a Preliminary Injunction preserving the status quo and enjoining all parties hereto from taking any actions, including seizing of collateral, until further order of court.

## COUNT TWO -- SECURITIES VIOLATION A-2 PARTICIPATION INTEREST

42.

The allegations of paragraphs 1 through 41 are incorporated herein by reference.

43.

On or about July 27, 2007, Defendant WDC sold an unregistered security to Acme for the sum of Three Million Dollars ($3,000,000.00), representing a certain interest in the Bay Harbor Project. This interest was described as "**A-2 Participation Interest.**"

44.

As the inducement for Acme to purchase the aforesaid A-2 Participation Interest, Defendant WDC represented that Acme would receive profits from said interest through the

10

entrepreneurial or managerial efforts of Defendant WDC. Based on said representations, Acme's expectation of profits was reasonable.

45.

In reliance on Defendant WDC's representations as aforesaid, Acme secured and deposited with Defendant WDC an irrevocable letter of credit in the amount of $3,000,000.00 with a one-year term. Defendant WDC represented and agreed that it would aggressively market the aforesaid A-2 Participation Interest, and that Defendant WDC would hold said letter of credit until the sale of said Interest.

46.

Defendant WDC's representation that it would aggressively market the aforesaid A-2 Participation Interest on behalf of Acme was false when made, and Defendant WDC made such false representation knowingly with the intent to defraud Acme.

47.

Defendant WDC's representation that Acme's A-2 Participation Interest would be sold for a profit quickly was false when made, and Defendant WDC made such false representation knowingly with the intent to defraud Acme.

48.

The actions of Defendant WDC in selling an unregistered security as part of a scheme to defraud Acme were a violation of O.C.G.A. § 10-5-12 (a). Accordingly, Defendant WDC is liable to Acme for the $3,000,000 consideration paid, plus interest thereon at the rate of 6% per annum from July 27, 2007 to date of judgment.

11

## COUNT THREE -- SECURITIES VIOLATION A-3 PARTICIPATION INTEREST

49.

The allegations of paragraphs 1 through 48 above are incorporated by reference.

50.

On or about July 27, 2007, Defendant WDC sold an unregistered security to Acme for the sum of Three Million Two Hundred Fifty Thousand Dollars ($3,250,000.00), representing a certain interest in the Bay Harbor Project. This interest was described as **"A-3 Participation Interest."**

51.

As the inducement for Acme to purchase the aforesaid A-3 Participation Interest, Defendant WDC promised that Acme would receive profits from said interest through the entrepreneurial or managerial efforts of Defendant WDC. Based on said promises, Acme's expectation of profits was reasonable.

52.

Defendant WDC's representation that Acme's A-2 Participation Interest would be profitable was false when made, and Defendant WDC made such false representation knowingly with the intent to defraud Acme.

53.

The actions of Defendant WDC in selling an unregistered security as part of a scheme to defraud Acme were a violation of O.C.G.A. § 10-5-12 (a). Accordingly, Defendant WDC is liable to Acme for the $3,250,000 consideration paid, plus interest thereon at the rate of 6% per annum from July 27, 2007 to date of judgment.

12

## COUNT FOUR – CONVERSION

54.

The allegations of paragraphs 1 through 53 above are incorporated by reference.

55.

On or about July 24, 2008, Defendant WDC, acting in furtherance of the conspiracy with the other Defendants named herein, improperly drew against Acme's Three Million Dollar ($3,000,000.00) letter of credit that Defendant WDC was holding under an agreement to make a specified application of such letter of credit. Defendant WDC knowingly converting Acme's letter of credit to its own use in violation of the agreement to hold said letter of credit until Acme's "A-3 Participation Interest" in the Bay Harbor Project was sold, an event that never occurred.

56.

Defendant WDC is liable to Acme for the Three Million Dollar ($3,000,000) value of the letter of credit that Defendant WDC wrongfully converted to its own use.

## COUNT FIVE -- SPECIFIC PERFORMANCE

57.

The allegations of paragraphs 1 through 56 above are incorporated by reference.

58.

Vista is ready and able to contribute Lenox Vista to the Company on the same terms and conditions that Defendant WDC agreed upon as the inducement for Vista to enter into the Agreement. Vista is entitled to an order for specific performance requiring that Defendant WDC

13

accept Lenox Vista as part of the Company's portfolio, and that Defendant WDC release the One Million Five Hundred Thousand Dollar ($1,500,000) Letter of Credit to Vista.

## COUNT SIX -- BREACH OF CONTRACT

59.

The allegations of paragraphs 1 through 58 above are incorporated by reference.

60.

Vista has suffered actual damages, in an amount to be proved at trial, as the proximate result of Defendant's breach of the Agreement by refusing to accept the substitution of collateral as pled above.

61.

In the event that specific performance is not awarded to Vista, Vista would be entitled to a judgment for its proven actual damages caused by Defendant's breach of contract as aforesaid.

## COUNT SEVEN -- RICO VIOLATIONS

62.

The allegations of paragraphs 1 through 61 above are incorporated by reference.

63.

The Defendants, conspired with each other, and engaged in a pattern of racketeering activity directed against Acme, and which directly harmed Acme, where Defendants endeavored to, or did, acquire or maintain an interest in property (Acme's letter of credit and money) in violation of the Georgia RICO (Racketeer Influenced and Corrupt Organizations Act), O.C.G.A.

14

§ 16-14-1, *et seq*. **This pattern included, but is not necessarily limited to, the following predicate acts:**

(1) **Theft by deception in violation of O.C.G.A. § 16-8-3** when on July 27, 2007, Defendant WDC, acting in furtherance of the conspiracy with the other Defendants named herein, obtained, by means of false or fraudulent pretenses, Acme's letter of credit in the amount of Three Million Dollars ($3,000,000.00) in return for a worthless security described as "**A-2 Participation Interest.**" Defendant WDC knowingly and deliberately created the false impression that said security had value, and that it would be sold for a profit caused by Defendant WDC's entrepreneurial efforts. Defendant WDC's true intent was to obtain Acme's letter of credit by deceitful means with the intention of depriving Acme of said letter of credit.

(2) **Sale of an unregistered security in violation of O.C.G.A. § 10-5-24** when on July 27, 2007, Defendant WDC, acting in furtherance of the conspiracy with the other Defendants named herein, in furtherance of a scheme to defraud Acme, sold an unregistered security to Acme for the sum of Three Million Dollars ($3,000,000.00), representing a certain interest in a project known as the Bay Harbor Project. This interest was described as "A-2 Participation Interest."

(3) **Theft by deception in violation of O.C.G.A. § 16-8-3** when on July 27, 2007, Defendant WDC, acting in furtherance of the conspiracy with the other Defendants named herein, obtained from Acme, by means of false or fraudulent pretenses, cash in the amount of Three Million Two Hundred Fifty Thousand Dollars ($3,250,000.00) in return for a worthless security described as "**A-3 Participation Interest.**" Defendant WDC

knowingly and deliberately created the false impression that said security had value, and

that it would be sold for a profit caused by Defendant WDC's entrepreneurial efforts.

(4)     **Sale of an unregistered security in violation of O.C.G.A. § 10-5-24** when on July 27,

2007, Defendant WDC, acting in furtherance of the conspiracy with the other Defendants

named herein, in furtherance of a scheme to defraud Plaintiff Acme, sold an unregistered

security to Plaintiff Acme for the sum of Three Million Two Hundred Fifty Thousand

Dollars ($3,250,000.00), representing a certain interest in a project known as the Bay

Harbor Project. This interest was described as **"A-3 Participation Interest."**

(5)     **Theft by conversion in violation of O.C.G.A. § 16-8-3** when on or about July 24, 2008,

Defendant WDC, acting in furtherance of the conspiracy with the other Defendants

named herein, improperly drew against Acme's $3,000,000 letter of credit that Defendant

WDC was holding under an agreement to make a specified application of such letter of

credit, thereby knowingly converting Acme's letter of credit to its own use in violation of

the agreement

## COUNT EIGHT -- PUNITIVE DAMAGES

64.

The allegations of paragraphs 1 through 63 above are incorporated by reference.

65.

Defendants' intentional wrongful actions set forth herein, such as selling unregistered

securities in furtherance of a scheme to defraud Acme, and by engaging in a pattern of

racketeering activity in violation of the Georgia RICO (Racketeer Influenced and Corrupt

Organizations) Act show by clear and convincing evidence that Defendants' misconduct was

16

intentional, willful, wanton, oppressive, malicious, fraudulent, and reckless, and evidences such an entire want or lack of care as to raise the presumption of a conscious indifference to the consequences of their actions.

66.

Plaintiffs are entitled to a judgment against Defendants, in a bifurcated hearing and following a specific jury finding pursuant to O.C.G.A. § 51-12-5.1 for punitive and exemplary damages, in an amount to be determined by the enlightened conscience of impartial jurors, to punish and deter Defendants from repeating such conduct in the future.

## COUNT NINE — ATTORNEY FEES AND EXPENSES OF LITIGATION

67.

The allegations of paragraphs 1 through 66 above are incorporated by reference.

68.

Defendants have acted in bad faith, have been stubbornly litigious, or have caused Plaintiffs unnecessary trouble and expense, therefore entitling Plaintiffs to an award of expenses of litigation under O.C.G.A. §13-6-11.

**WHEREFORE**, Plaintiffs respectfully pray as follows:

a. **Under Count One**, that a Preliminary Injunction issue, preserving the status quo until further order from this Court, and that thereafter a Declaratory Judgment issue, adjudicating the rights and liabilities of Plaintiffs and Defendants,

b. **Under Count Two**, because of Defendants' sale of the unregistered security known as "A-2 Participation Interest," Acme has been damaged and is entitled to recover Three

17

Million Dollars ($3,000,000.00), plus interest thereon at the rate of 6% per annum from July 27, 2007 to date of judgment;

b.     **Under Count Three**, because of Defendants' sale of the unregistered security known as "A-3 Participation Interest," Acme has been damaged and is entitled to recover Three Million Two Hundred Fifty Thousand Dollars ($3,250,000.00), plus interest thereon at the rate of 6% per annum from July 27, 2007 to date of judgment;

c.     **Under Count Four,** Acme is entitled to recover Three Million Dollars ($3,000,000.00) plus interest for Defendant's wrongful conversion of its letter of credit;

d.     **Under Count Five,** Vista is entitled to an order of specific performance ordering Defendant WDC to substitute Lenox Vista for Vista's One Million Five Hundred Thousand Dollar ($1,500,000) letter of credit;

e.     **Under Count Six,** Vista is entitled to recover its actual damages for Defendant WDC's breach of the Agreement;

f.     **Under Count Seven,** Plaintiff Acme is entitled to recover three times its actual damages of Three Million Dollars ($3,000,000.00) for Defendants' violations of the Georgia RICO (Racketeer and Corrupt Organizations) Act in regard to that unregistered security known as "A-2 Participation Interest;"

g.     **Under Count Seven,** Plaintiff Acme is entitled to recover three times its actual damages of Three Million Two Hundred Fifty Thousand Dollars ($3,250,000.00) for Defendants' violations of the Georgia RICO (Racketeer and Corrupt Organizations) Act in regard to that unregistered security known as "A-3 Participation Interest;"

18

h. **Under Count Seven**, because Defendants violated the Georgia RICO (Racketeer and Corrupt Organizations) Act, Plaintiffs are entitled to an award of reasonable attorney's fees.

i. **Under Count Eight**, Plaintiffs are entitled to recover punitive or exemplary damages, in a bifurcated hearing and following a specific jury finding pursuant to O.C.G.A. § 51-12-5.1 that punitive and exemplary damages should be awarded, in an amount to be determined by the enlightened conscience of impartial jurors, to punish and deter Defendants from repeating such conduct in the future.

g. **Under Count Nine,** because Defendants have acted in bad faith, or have been stubbornly litigious, or have caused Plaintiff unnecessary trouble and expense, Plaintiffs are entitled to recover their expenses of litigation, including reasonable attorney's fees.

h. Plaintiffs further pray that a jury trial be had on all issues of fact; and

i. That this Court grant such other and further relief as may be deemed proper.

480 Mt. Vernon Hwy. NE
Atlanta GA 30328—4142
404-257-3000
404-257-0003 Fax
gwf@bellsouth.net

Graydon W. Florence
Georgia Bar Number 264900
Attorney for Plaintiffs

19

## VERIFICATION

The undersigned, being duly sworn, deposes and says that:

1. He is an adult person, competent to testify as to the matters set out herein, and knows the facts set out herein of his own personal knowledge.

2. He is the manager of Vista Realty Holdings, LLC and Acme Lending, LLC.

3. He has read the foregoing Complaint, and states that the facts set out in said Complaint are true and correct.

This 6th day of November 2008.

_____
Eduard de Guardiola

Sworn to and subscribed before me

this 6th day of November 2008.

_____
Notary Public
_____ County, Georgia
My Commission expires _____.

**Notary Public
My Commission Expires April 12, 2009
Fulton County, Georgia**

# LIMITED LIABILITY COMPANY AGREEMENT OF

## VISTA REALTY PORTFOLIO INVESTMENTS LLC

**As of July 27, 2007**

THE MEMBERSHIP INTERESTS (AS DEFINED HEREIN) IN THE COMPANY (AS DEFINED HEREIN) ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD IN WHOLE OR IN PART EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. IN ADDITION, INVESTORS MAY NOT RESELL, TRANSFER OR OTHERWISE DISPOSE OF ANY MEMBERSHIP INTEREST IN WHOLE OR IN PART EXCEPT IN COMPLIANCE WITH THE OPERATING AGREEMENT OF THE COMPANY. ACCORDINGLY, INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

EXHIBIT "A"

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS.................................................................................. 1
    Section 1.1    Definitions........................................................................... 1

ARTICLE 2 ORGANIZATIONAL MATTERS; PURPOSE; TERM ......................... 11
    Section 2.1    Formation of Company ....................................................... 11
    Section 2.2    Name.................................................................................. 11
    Section 2.3    Registered Office; Registered Agent; Principal Office .......... 11
    Section 2.4    Foreign Qualification.......................................................... 11
    Section 2.5    Purpose and Scope ............................................................ 12
    Section 2.6    Term.................................................................................. 12
    Section 2.7    No State Law Partnership ................................................... 12

ARTICLE 3 MEMBERSHIP; DISPOSITIONS OF INTERESTS; REPRESENTATIONS,
        WARRANTIES AND COVENANTS ................................................ 12
    Section 3.1    Members ............................................................................ 12
    Section 3.2    Dispositions of Membership Interests ................................. 12
    Section 3.3    Creation of Additional Membership Interests........................ 14
    Section 3.4    Resignation ....................................................................... 14
    Section 3.5    Information ........................................................................ 14
    Section 3.6    Liability to Third Parties ..................................................... 14
    Section 3.7    Representations and Warranties of Developer Member.......... 14
    Section 3.8    Covenants of the Manager and the Developer Member .......... 17

ARTICLE 4 MANAGEMENT OF COMPANY................................................... 24
    Section 4.1    Management........................................................................ 24
    Section 4.2    Construction ...................................................................... 28
    Section 4.3    Operating Budgets and Expenditures................................... 33
    Section 4.4    Meetings of Members ......................................................... 34
    Section 4.5    Officers ............................................................................. 35
    Section 4.6    Reimbursement of Expenses............................................... 35
    Section 4.7    Compensation of Members ................................................. 35
    Section 4.8    Transactions with Affiliates ................................................ 35
    Section 4.9    Development Matters .......................................................... 35
    Section 4.10   Indemnification; Reimbursement of Expenses; Insurance ...... 35
    Section 4.11   Conflicts of Interest............................................................ 36

ARTICLE 5  ACCOUNTING AND REPORTING; BUSINESS PLAN.................... 36
    Section 5.1    Fiscal Year, Accounts, Reports............................................ 36
    Section 5.2    Bank Accounts................................................................... 38
    Section 5.3    Financial Accounting Matters Member ................................ 38
    Section 5.4    Business Plan ..................................................................... 38

ARTICLE 6 CAPITAL CONTRIBUTIONS....................................................... 38

Section 6.1    Initial Capital Contributions ........................................................ 38
Section 6.2    Required Additional Capital Contributions ............................... 39
Section 6.3    Failure to Make Additional Capital Contributions ................... 39
Section 6.4    Return of Contributions ............................................................. 40
Section 6.5    Balances ...................................................................................... 40

ARTICLE 7 PREFERENCES ................................................................................ 40
Section 7.1    Funding and Distribution of Preferred Return ......................... 40
Section 7.2    Calculation of Preferred Return ................................................ 40

ARTICLE 8 REQUIRED PAYMENTS; NON-LIQUIDATION DISTRIBUTIONS ............... 41
Section 8.1    Distributions of Net Cash Flow. ............................................... 41
Section 8.2    Payments and Distributions of Capital Proceeds ..................... 41
Section 8.3    Member Loan Proceeds ............................................................. 41

ARTICLE 9 REQUIRED REDEMPTION.................................................................. 42
Section 9.1    Required Redemption ................................................................. 42

ARTICLE 10  BUY-SELL OPTION......................................................................... 42
Section 10.1   Buy-Sell Option ......................................................................... 42

ARTICLE 11 DEVELOPER MEMBER EVENTS OF DEFAULT; REMEDIES .................... 44
Section 11.1   Developer Member Events of Default ...................................... 44
Section 11.2   Remedies...................................................................................... 45

ARTICLE 12 RESERVE ACCOUNTS; CASH MANAGEMENT.............................. 46
Section 12.1   Reserve Accounts........................................................................ 46
Section 12.2   Cash Management........................................................................ 46
Section 12.3   Preferred Return Reserve........................................................... 46

ARTICLE 13 RECOURSE LIABILITIES ................................................................. 47
Section 13.1   Recourse Liabilities ................................................................... 47

ARTICLE 14 PROPERTY MANAGEMENT FEE; AFFILIATE COMPENSATION............. 48
Section 14.1   Property Management Fee; Affiliate Compensation ................ 48

ARTICLE 15 THIRD PARTY FINANCING ............................................................. 48
Section 15.1   Initial Financing.......................................................................... 48
Section 15.2   Permanent Financing ................................................................. 49
Section 15.3   Consent to Exercise of Remedies; Notices and Cure Rights .... 49
Section 15.4   Letter of Credit............................................................................ 49

ARTICLE 16 CAPITAL ACCOUNTS, ALLOCATIONS, AND TAX MATTERS................. 50
Section 16.1   Definitions.................................................................................... 50
Section 16.2   Capital Accounts ........................................................................ 52
Section 16.3   Adjustment of Gross Asset Value.............................................. 52
Section 16.4   Profits, Losses and Distributive Shares of Tax Items.............. 53
Section 16.5   Tax Returns.................................................................................. 57

ii

Section 16.6    Tax Elections ............................................................................ 57
Section 16.7.   Tax Matters Partner.................................................................... 57
Section 16.8    Allocations on Transfer of Interests............................................ 57

ARTICLE 17 WITHDRAWAL, DISSOLUTION, LIQUIDATION, AND TERMINATION... 58
Section 17.1    Dissolution, Liquidation, and Termination Generally ............................ 58
Section 17.2    Liquidation and Termination ...................................................... 58
Section 17.3    Deficit Capital Accounts............................................................ 59
Section 17.4    Cancellation of Certificate ........................................................ 59

ARTICLE 18 PURCHASE OF MEMBERSHIP INTEREST........................................ 59
Section 18.1    General........................................................................................ 59
Section 18.2    Assignment of Membership Interest........................................... 59
Section 18.3    Transfer of Management............................................................ 60
Section 18.4    Release and Indemnity .............................................................. 60
Section 18.5    Transfer Tax............................................................................... 60
Section 18.6    Assignment by Acquiring Member.............................................. 60

ARTICLE 19 MISCELLANEOUS PROVISIONS....................................................... 61
Section 19:1    Notices ...................................................................................... 61
Section 19.2    Approvals................................................................................... 61
Section 19.3    Governing Law .......................................................................... 61
Section 19.4    Entireties; Amendments............................................................ 61
Section 19.5    Waiver....................................................................................... 61
Section 19.6    Severability ............................................................................... 61
Section 19.7    Ownership of Property and Right of Partition ........................... 62
Section 19.8    Captions, References and Construction ..................................... 62
Section 19.9    Involvement of Members in Certain Proceedings ..................... 62
Section 19.10 I nterest....................................................................................... 62
Section 19.11 Counterparts ............................................................................... 62
Section 19.12 Gener al Indemnification ............................................................. 62
Section 19.13 Publicit y .................................................................................... 62
Section 19.14 Opinions of Counsel .................................................................. 63
Section 19.15 Time of the Essenc e .................................................................. 63
Section 19.16 Estoppel Certificate ................................................................... 63
Section 19.17 Right of Offs et .......................................................................... 63
Section 19.18 Waiver of Certain D efenses........................................................ 63
Section 19.19 Waiver of Jur y Trial................................................................... 64
Section 19.20 Confidentialit y .......................................................................... 64

# LIMITED LIABILITY COMPANY AGREEMENT OF

# VISTA REALTY PORTFOLIO INVESTMENTS LLC

This Limited Liability Company Agreement (this "**Agreement**") is entered into as of July 27, 2007 (the "**Effective Date**"), between VISTA REALTY HOLDINGS, LLC (the "**Developer Member**"), as a Member and Manager, WACHOVIA DEVELOPMENT CORPORATION, a North Carolina corporation, as a Member (the "**Wachovia Member**"), and, solely for the purpose of making the covenants set forth in Section 3.9 of this Agreement, the EDG GA Trust (the "**Trust**").

## ARTICLE 1
## DEFINITIONS

**Section 1.1    Definitions.**  As used in this Agreement, the following terms shall have the following meanings:

"**Act**" means the Delaware Limited Liability Company Act, as it may be amended from time to time.

"**Additional Capital Contributions**" means, for the Developer Member, the amount of Capital Contributions made by that Member, in excess of that Member's Initial Capital Contribution.

"**Adjusted Net Cash Flow**" means Adjusted Net Operating Income less (i) Debt Service, and (ii) capital expenditures for the Project for such period or any prior period if due and unpaid with respect to which no reserves have been established.

"**Adjusted Net Operating Income**" means, for any period, the amount by which Adjusted Operating Revenues exceed Adjusted Operating Expenses.

"**Adjusted Operating Expenses**" means Operating Expenses, as determined and adjusted by the Wachovia Member in accordance with its then current, reasonable underwriting policies and procedures including, without limitation, the exclusion of the Management Fee.

"**Adjusted Operating Revenues**" means Operating Revenues, as determined and adjusted by the Wachovia Member in accordance with its then current, reasonable underwriting policies and procedures including, without limitation, adjusting revenues to a maximum occupancy rate of 5%, the exclusion of forfeited earnest money deposits and the exclusion of interest income.

"**Affiliate**" means, as to any Member, (a) any corporation in which such Member or any partner, shareholder, director, officer, member, or manager of such Member, directly or indirectly, owns or controls more than ten percent (10%) of the beneficial interest, (b) any partnership, joint venture or limited liability company in which such Member or any partner,

shareholder, director, officer, member, or manager of such Member is a partner, joint venturer or member, (c) any trust in which such Member or any partner, shareholder, director, officer member or manager of such Member is a trustee or beneficiary, (d) any entity of any type which is directly or indirectly owned or controlled by such Member or any partner, shareholder, director, officer, member or manager of such Member, (e) any partner, shareholder, director, officer, member, manager or employee of such Member, or (f) any Person related by birth, adoption or marriage to any partner, shareholder, director, officer, member, manager or employee of such Member.

"**Bankruptcy**" means, with respect to a Person, the occurrence of (1) an assignment by a Person for the benefit of creditors; (2) the filing by a Person of a voluntary petition in bankruptcy; (3) the entry of a judgment by any court that a Person is bankrupt or insolvent, or the entry against a Person of an order for relief in any bankruptcy or insolvency proceeding; (4) the filing of a petition or answer by a Person seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (5) the filing by a Person of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding for reorganization or of a similar nature; (6) the consent or acquiescence of a Person to the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties; (7) the admission by the Person in writing of its inability to pay its debts as they mature; (8) the filing of a petition against the Person seeking to have an order for relief entered against such Person as debtor or seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, which petition is not dismissed within sixty (60) days after being filed; or (9) any other event which would cause a Person to cease to be a member of a limited liability company under Section 18-304 of the Act.

"**Capital Contribution**" means, with respect to each Member, the amount of cash and the initial Gross Asset Value of any property (net of liabilities assumed by the Company resulting from such contribution and liabilities to which the property is subject) contributed to the Company by that Member.

"**Capital Proceeds**" means funds of the Company arising from a Capital Transaction, net of the actual costs incurred by the Company with third parties in consummating such Capital Transaction.

"**Capital Sharing Ratios**" means the percentages in which the Members participate in certain Company decisions.  The Capital Sharing Ratios of the Members are as follows:

| | |
|---|---|
| Developer Member | 60% |
| Wachovia Member | 40% |

"**Capital Transaction**" means the sale, financing, refinancing or similar transaction of or involving an Individual Project (including condemnation, payment of title insurance proceeds or casualty loss insurance proceeds, other than business interruption or rental loss insurance proceeds, to the extent not applied to mortgage indebtedness of the Company and not used to repair damage caused by a casualty or taking or in alleviation of any title defect).

2

"**Closing Date**" means the date on which the Wachovia Member makes its Initial Capital Contribution to the Company.

"**Company**" means Vista Realty Portfolio Investments LLC, a Delaware limited liability company.

"**Construction Project**" means, individually or collectively, as the case may require, the Lindbergh Project, the Parkside Project, the Southwood Project and/or the Woodside I Project.

"**Cost Overrun**" means the amount by which the cost incurred for a line item in the Development Budget exceeds the amount allocated for the line item (other than costs incurred by the Wachovia Member pursuant to the Joint Development Agreement not otherwise approved by the Developer Member) in the Development Budget after the crediting of any Cost Savings from another line item in the Development Budget to the extent expressly permitted under the terms of this Agreement or as otherwise specified in Section 4.2.

"**Cost Savings**" means the amount by which the sum of all costs paid for a line item in the Development Budget on which all work has been completed where all such costs paid is less than the amount allocated for that line item.

"**Cumulative Wachovia Minimum Amount**" means the sum of the Sandtown Minimum Amount, the Lindbergh Multifamily Minimum Amount, the Lindbergh Retail Minimum Amount, the Marquis Minimum Amount, the Parkside Minimum Amount, the Southwood Minimum Amount, the Woodside I Minimum Amount, and the Woodside II Minimum Amount.

"**Debt Service**" means, except as otherwise provided in this Agreement, the aggregate of (i) interest, fixed principal, and other payments due on the Loan under the terms of the Loan Documents and (ii) the Unpaid Preferred Return due, for the period of time for which calculated.

"**Default Rate**" means the lesser of 17% per annum, or the highest per annum interest rate permitted under the laws of the state of Georgia (in either case, compounded monthly).

"**Default Contribution**" means any Additional Capital Contribution made by the Wachovia Member.

"**Developer Member Event of Default**" means the occurrence of one or more events described in Section 11.1 of this Agreement.

"**Development Budget**" means the budget with respect to the Construction Project, attached as Exhibit B, setting forth in detail all estimated expenditures required for the development and construction of each Construction Project, and the sources of funds therefor.

"**Effective Date**" means the date set forth in the initial paragraph of this Agreement as the effective date of this Agreement.

"**Environmental Agreement**" means that certain Environmental Indemnity Agreement dated as of the date hereof from the Developer Member and the Principal for the benefit of the Wachovia Member.

"**Excess Sales Proceeds**" means an amount that is the difference between the Wachovia Proceeds with respect to an Individual Project, less the Wachovia Minimum Amount with respect to such Individual Project.

"**Force Majeure**" means strikes, lock-outs, riots or other labor troubles, unavailability of materials, a national emergency, acts of terrorism, any rule, order or regulation of governmental authorities, tornadoes, floods, hurricanes or other natural disasters, or other similar causes not within the Developer Member's control.

"**Guaranty**" means that certain Indemnity and Guaranty Agreement dated as of the date hereof from the Principal and Developer Member in favor of the Company and the Wachovia Member.

"**Imputed Closing Costs**" means an amount not to exceed two percent (2%) of the purchase price that would normally be incurred by the Company if the Project were sold to a Person that is not an Affiliate of either Member, for title insurance premiums, survey costs, brokerage commissions, and other commercially reasonable closing costs.

"**Individual Plans**" means any one of the following: the Lindbergh Multifamily Plans, the Lindbergh Retail Plans, the Parkside Plans, the Southwood Plans, the Woodside I Plans, the Woodside II Plans, the Sandtown Plans, and the Marquis Plans.

"**Individual Project**" means any one of the following: the Lindbergh Project, the Parkside Project, the Southwood Project, the Woodside I Project, the Woodside II Project, the Sandtown Project, and the Marquis Project.

"**Initial Capital Contribution Balance**" means, for each Member, the total Initial Capital Contributions of that Member, less the cumulative distributions to that Member in return thereof pursuant to Sections 8.1 and 8.2.

"**Initial Capital Contributions**" means the Capital Contributions to be initially contributed by each Member to the Company in accordance with Section 6.1. The Initial Capital Contributions of each Member are as follows:

| | |
|---|---|
| Developer Member | $18,273,091.31 |
| Wachovia Member | $25,000,000.00 |

"**Land**" means the real property described in Exhibits A-1 through A-7 located in the State of Georgia.

"**Lender**" means the financial institution which from time to time provides any Loan to the Company.

"**Lindbergh Multifamily Completion Date**" means the date specified for Substantial Completion of the construction of the Lindbergh Multifamily Project, which is June 30, 2008. However, the Lindbergh Multifamily Completion Date may be extended with the approval of the Wachovia Member (which approval shall not be unreasonably withheld) based upon delays in the Construction Work caused by Force Majeure.

"**Lindbergh Multifamily Minimum Amount**" means an amount that is equal to $9,650,000, less any Excess Sales Proceeds that have not yet been applied to reduce a Wachovia Minimum Amount.

"**Lindbergh Multifamily Plans**" means the plans and specifications for the construction of the Lindbergh Multifamily Project, as approved or as will be approved by the Manager and the Wachovia Member, and all changes thereto that have been approved by the Manager and the Wachovia Member.

"**Lindbergh Multifamily Wachovia Proceeds**" means an amount to be distributed to the Wachovia Member that is a portion of the Capital Proceeds with respect to the Lindbergh Multifamily Project, which amount is the greater of (i) seventy-five percent (75%) of such Capital Proceeds, or (ii) the Lindbergh Multifamily Minimum Amount.

"**Lindbergh Project**" means that portion of the Land and the mixed use and multifamily Individual Project that is currently under construction on such portion of the Land, at the location which is more particularly described on Exhibit A-1, which project is comprised of two parts: (i) the first floor of the to-be constructed building, which shall be used for retail purposes (the "**Lindbergh Retail Project**", and (ii) the remainder of the to-be constructed building, which shall be used for such purposes as specified in the Lindbergh Multifamily Plans (the "**Lindbergh Multifamily Project**").

"**Lindbergh Retail Completion Date**" means the date specified for Substantial Completion of the construction of the Lindbergh Retail Project, which is June 30, 2008. However, the Lindbergh Retail Completion Date may be extended with the approval of the Wachovia Member (which approval shall not be unreasonably withheld) based upon delays in the Construction Work caused by Force Majeure.

"**Lindbergh Retail Minimum Amount**" means an amount that is equal to $1,350,000, less any Excess Sales Proceeds that have not yet been applied to reduce a Wachovia Minimum Amount.

"**Lindbergh Retail Plans**" means the plans and specifications for the construction of the Lindbergh Retail Project, as approved or as will be approved by the Manager and the Wachovia Member, and all changes thereto that have been approved by the Manager and the Wachovia Member.

"**Lindbergh Retail Wachovia Proceeds**" means an amount to be distributed to the Wachovia Member that is a portion of the Capital Proceeds with respect to the Lindbergh Retail Project, which amount is the greater of (i) seventy-five percent (75%) of such Capital Proceeds, or (ii) the Lindbergh Retail Minimum Amount.

"**Loan**" means, collectively, any and all loans that will be or currently are secured by any Individual Project or combination of Individual Projects, to be assumed or obtained, as the case may be, by the Company, and any loan which refinances such Loan from a Lender selected by the Manager and approved by all the Members (provided, however, such decision, approval or consent shall be made in the sole discretion of the Wachovia Member following a Developer Member Event of Default), all as specified in Article 15. The Loan is more particularly

described, with respect to each Individual Project (each, an "**Individual Loan**") on Exhibits E-1 through E-7.

"**Loan Documents**" mean the documents evidencing or securing any Loan.

"**Manager**" means the Developer Member as the initial Manager and each Person hereafter designated as a Manager in accordance with this Agreement, until such Person ceases to be a Manager of the Company.

"**Marquis Minimum Amount**" means an amount that is equal to $1,600,000, less any Excess Sales Proceeds that have not yet been applied to reduce a Wachovia Minimum Amount.

"**Marquis Plans**" means the plans and specifications for the construction of the Marquis Project, as approved or as will be approved by the Manager and the Wachovia Member, and all changes thereto that have been approved by the Manager and the Wachovia Member.

"**Marquis Project**" means that portion of the Land and the mixed use and multifamily Individual Project to be located thereon, which location is more particularly described on Exhibit A-2.

"**Marquis Wachovia Proceeds**" means an amount to be distributed to the Wachovia Member that is a portion of the Capital Proceeds with respect to the Marquis Project, which amount is the greater of (i) ninety percent (90%) of such Capital Proceeds, or (ii) the Marquis Minimum Amount.

"**Maximum Loan-to-Cost Ratio**" means a ratio that is equal to 90%.

"**Maximum Loan-to-Value Ratio**" means a ratio that is equal to 85%.

"**Members**" means the Wachovia Member, the Developer Member, and each Person hereafter admitted as a Member in accordance with this Agreement, until such Person ceases to be a Member of the Company.

"**Membership Interests**" means all of the rights and interests of whatever nature of the Members in the Company, including without limitation, the right to participate in management to the extent herein expressly provided, to receive distributions of funds, and to receive allocations of income, gain, loss, deduction, and credit.

"**Net Cash Flow**" means Net Operating Income less (i) Debt Service, and (ii) capital expenditures for the Project for such period or any prior period if due and unpaid with respect to which no reserves have been established.

"**Net Operating Income**" means, for any period, the amount by which Operating Revenues exceed Operating Expenses.

"**Operating Budget**" means the annual budget with respect to any Individual Project, prepared by the Manager and approved in writing by the Wachovia Member, and setting forth the estimated capital and operating expenses of the Company relating to such Individual Project,

for the then current or immediately succeeding calendar year and for each month and each calendar quarter of said calendar year, in such detail as the Wachovia Member shall require.  All of the approved Operating Budgets for the balance of the current calendar year are attached hereto as Exhibit G.

"**Operating Expenses**" means, for any period, the current obligations of the Company for such period, determined in accordance with sound accounting principles approved by the Wachovia Member and applicable to commercial real estate, consistently applied, for operating expenses of the Project, for capital expenditures not paid from the Members' Capital Contributions to the Company, and for reserves actually funded.  Operating Expenses shall not include Debt Service or any non-cash expenses such as depreciation or amortization.

"**Operating Revenues**" means, for any period, the gross revenues of the Company arising from the ownership and operation of the Project during such period, including proceeds of any business interruption insurance maintained by the Company from time to time and amounts funded from Company reserves, but specifically excluding Capital Proceeds and Capital Contributions of the Members, other than Additional Capital Contributions funded by the Developer Member to pay any Unpaid Preferred Return pursuant to Section 6.2 of this Agreement.

"**Parkside Completion Date**" means the date specified for Substantial Completion of the construction of the Parkside Project, which is November 30, 2007.   However, the Parkside Completion Date may be extended with the approval of the Wachovia Member (which approval shall not be unreasonably withheld) based upon delays in the Construction Work caused by Force Majeure.

"**Parkside Minimum Amount**" means an amount that is equal to $5,300,000, less any Excess Sales Proceeds that have not yet been applied to reduce a Wachovia Minimum Amount.

"**Parkside Plans**" means the plans and specifications for the construction of the Parkside Project, as approved by the Manager and the Wachovia Member, and all changes thereto that have been approved by the Manager and the Wachovia Member.

"**Parkside Project**" means that portion of the Land and the mixed use and multifamily Individual Project that is currently under construction on such portion of the Land, at the location which is more particularly described on Exhibit A-3.

"**Parkside Wachovia Proceeds**" means an amount to be distributed to the Wachovia Member that is a portion of the Capital Proceeds with respect to the Parkside Project, which amount is the greater of (i) ninety percent (90%) of such Capital Proceeds, or (ii) the Parkside Minimum Amount.

"**Person**" means any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company, joint stock company, trust or unincorporated organization.

"**Plans**" means, collectively, the plans and specifications for the construction of the Project, as approved by the Manager and the Wachovia Member, and all changes thereto that have been approved by the Manager and the Wachovia Member.

"**Preferred Return**" means the return to be paid to the Wachovia Member on its contributions to the capital of the Company as set forth in Article 7 of this Agreement. The Preferred Return shall accrue on all Capital Contributions from the Wachovia Member from the date such contributions are made until they are returned. The Preferred Return shall be cumulative and shall compound monthly.

"**Preferred Return Reserve**" means the reserve account established pursuant to and described in Section 12.3 of this Agreement.

"**Principal**" means the Person identified below who directly or indirectly controls the Developer Member:

> Eduard de Guardiola
> 1100 Peachtree Street, Suite 1500
> Atlanta, Georgia 30309

"**Prohibited Act**" means (1) any act in contravention of this Agreement; (2) possessing any Company assets or assigning the rights of the Company in specific Company assets for other than Company purposes; (3) admitting a person or entity as a Member except as provided in this Agreement; (4) permitting the Company to merge or consolidate with any other entity; (5) amending this Agreement; or (6) except as otherwise permitted under this Agreement, amending, modifying or otherwise altering the terms or conditions of any Loan or Loan Documents.

"**Project**" means, collectively, the Lindbergh Multifamily Project, the Lindbergh Retail Project, the Parkside Project, the Southwood Project, the Woodside I Project, the Woodside II Project, the Sandtown Project, and the Marquis Project.

"**Required Additional Capital Contributions**" means the Additional Capital Contributions required of the Developer Member pursuant to the provisions of Section 6.2 of this Agreement.

"**Required Redemption Amount**" means the amounts to be distributed to the Wachovia Member under Sections 8.1 and 8.2 of this Agreement.

"**Required Redemption Date**" means the earlier of (i) the date on which the Wachovia Member receives the Required Redemption Amount, and (ii) three (3) years from the date hereof.

"**Sandtown Minimum Amount**" means an amount that is equal to $1,300,000, less any Excess Sales Proceeds that have not yet been applied to reduce a Wachovia Minimum Amount.

"**Sandtown Plans**" means the plans and specifications for the construction of the Sandtown Project, as approved or will be approved by the Manager and the Wachovia Member, and all changes thereto that have been approved by the Manager and the Wachovia Member.

"**Sandtown Project**" means that portion of the Land and the mixed use and multifamily Individual Project to be located thereon, which location is more particularly described on Exhibit A-4.

"**Sandtown Wachovia Proceeds**" means an amount to be distributed to the Wachovia Member that is a portion of the Capital Proceeds with respect to the Sandtown Project, which amount is the greater of (i) ninety percent (90%) of such Capital Proceeds, or (ii) the Sandtown Minimum Amount.

"**Southwood Completion Date**" means the date specified for Substantial Completion of the construction of the Southwood Project, which is September 30, 2008. However, the Southwood Completion Date may be extended with the approval of the Wachovia Member (which approval shall not be unreasonably withheld) based upon delays in the Construction Work caused by Force Majeure.

"**Southwood Minimum Amount**" means an amount that is equal to $8,300,000, less any Excess Sales Proceeds that have not yet been applied to reduce a Wachovia Minimum Amount.

"**Southwood Plans**" means the plans and specifications for the construction of the Southwood Project, as approved or as will be approved by the Manager and the Wachovia Member, and all changes thereto that have been approved by the Manager and the Wachovia Member.

"**Southwood Project**" means that portion of the Land and the mixed use and multifamily Individual Project that is currently under construction on such portion of the Land, at the location which is more particularly described on Exhibit A-5.

"**Southwood Wachovia Proceeds**" means an amount to be distributed to the Wachovia Member that is a portion of the Capital Proceeds with respect to the Southwood Project, which amount is the greater of (i) ninety percent (90%) of such Capital Proceeds, or (ii) the Southwood Minimum Amount.

"**SPE Owner**" means each of (i) Campbellton Vista LLC, (ii) Lindbergh Vista, LLC, (iii) Parkside Vista, LLC, (iv) 396 Piedmont LLC, (v) Woodside Vista, LLC, (vi) Woodside Vista II, LLC and (vii) Sandtown Vista LLC.

"**Substantial Completion**" means that (a) construction of the Individual Project has been substantially completed in accordance with the applicable Individual Plans, as evidenced by the issuance from the appropriate governmental authority of all certificates of occupancy and/or other approvals or permits that are required for the use and occupancy of all portions of such Individual Project and issuance of a certificate of substantial completion utilizing A.I.A. Form G-706 from such Individual Project architect, all without condition other than the completion of any minor punch-list items, and then currently out-of-season landscaping items, and (b) all Persons who have performed work or provided materials for the construction have been paid in full other than for minor punch-list items and out-of-season landscaping, as evidenced by lien releases and lien waivers from all such Persons. Notwithstanding the foregoing, if only "shell" space is being constructed, only such certificates, approvals or permits normally provided to

evidence compliance with applicable governmental requirements shall be required to be provided by the appropriate governmental authorities.

"**Trust**" shall mean the EDG GA Trust U/A/D December 1, 2005.

"**Undeveloped Project**" means, individually or collectively, as the case may require, the Marquis Project, the Sandtown Project and/or the Woodside II Project.

"**Unpaid Preferred Return**" means, at anytime, the excess of (a) the aggregate return calculated for the Wachovia Member pursuant to Sections 6.3(a) and 7.2 of this Agreement for all prior periods, over (b) the aggregate amount theretofore distributed to the Wachovia Member pursuant to Sections 8.1(a), 8.1(c), 8.2(a)(i) and 8.2(c) of this Agreement.

"**Unreturned Capital Contributions**" means, at any time, with respect to the Wachovia Member, the excess of (i) Capital Contributions theretofore made to the Company by the Wachovia Member, over (ii) the aggregate amount theretofore distributed to the Wachovia Member pursuant to Sections 8.1(b)(i), 8.2(b)(i) and 8.2(d).

"**Wachovia Minimum Amount**" shall mean any one of the following with respect to an Individual Project: Sandtown Minimum Amount, the Lindbergh Multifamily Minimum Amount, the Lindbergh Retail Minimum Amount, the Marquis Minimum Amount, the Parkside Minimum Amount, the Southwood Minimum Amount, the Woodside I Minimum Amount, and the Woodside II Minimum Amount.

"**Wachovia Proceeds**" shall mean any one of the following with respect to an Individual Project: Sandtown Wachovia Proceeds, the Lindbergh Multifamily Wachovia Proceeds, the Lindbergh Retail Wachovia Proceeds, the Marquis Wachovia Proceeds, the Parkside Wachovia Proceeds, the Southwood Wachovia Proceeds, the Woodside I Wachovia Proceeds, and the Woodside II Wachovia Proceeds.

"**Woodside I Completion Date**" means the date specified for Substantial Completion of the construction of the Woodside I Project, which is May 31, 2009. However, the Woodside I Completion Date may be extended with the approval of the Wachovia Member (which approval shall not be unreasonably withheld) based upon delays in the Construction Work caused by Force Majeure.

"**Woodside I Minimum Amount**" means an amount that is equal to $12,100,000, less any Excess Sales Proceeds that have not yet been applied to reduce a Wachovia Minimum Amount.

"**Woodside I Plans**" means the plans and specifications for the construction of the Woodside I Project, as approved or as will be approved by the Manager and the Wachovia Member, and all changes thereto that have been approved by the Manager and the Wachovia Member.

"**Woodside I Project**" means that portion of the Land and the mixed use and multifamily Individual Project that is currently under construction on such portion of the Land, at the location which is more particularly described on Exhibit A-6.

"**Woodside I Wachovia Proceeds**" means an amount to be distributed to the Wachovia Member that is a portion of the Capital Proceeds with respect to the Woodside I Project, which amount is the greater of (i) ninety percent (90%) of such Capital Proceeds, or (ii) the Woodside I Minimum Amount.

"**Woodside II Minimum Amount**" means an amount that is equal to $1,800,000, less any Excess Sales Proceeds that have not yet been applied to reduce a Wachovia Minimum Amount.

"**Woodside II Plans**" means the plans and specifications for the construction of the Woodside II Project, as approved or as will be approved by the Manager and the Wachovia Member, and all changes thereto that have been approved by the Manager and the Wachovia Member.

"**Woodside II Project**" means that portion of the Land and the mixed use and multifamily Individual Project to be located thereon, which location is more particularly described on Exhibit A-7.

"**Woodside II Wachovia Proceeds**" means an amount to be distributed to the Wachovia Member that is a portion of the Capital Proceeds with respect to the Woodside II Project, which amount is the greater of (i) ninety percent (90%) of such Capital Proceeds, or (ii) the Woodside II Minimum Amount.

## ARTICLE 2
## ORGANIZATIONAL MATTERS; PURPOSE; TERM

**Section 2.1    Formation of Company.**    The Company has been organized as a Delaware limited liability company by filing a certificate of formation (the "**Certificate**") under the Act. Ashley B. Menser, is hereby designated as an "authorized person" within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware.    Upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, her powers as an "authorized person" ceased, and the Members thereupon became the designated "authorized persons" and shall continue as the designated "authorized persons" within the meaning of the Act.

**Section 2.2    Name.**    The name of the Company shall be Vista Realty Portfolio Investments LLC, and all Company business shall be conducted in that name or such other name as the Manager and the Wachovia Member approve.

**Section 2.3    Registered Office; Registered Agent; Principal Office.**    The registered office and the registered agent of the Company in the State of Delaware shall be as specified in the Certificate or as designated by the Manager with the Wachovia Member's approval. The principal office of the Company and the mailing address shall be c/o Vista Realty Partners, 1100 Peachtree Street, N.E., Suite 1500, Atlanta, Georgia 30309. Unless otherwise approved by the Wachovia Member, all books and records of the Company shall be maintained at the Company's principal office.

**Section 2.4    Foreign Qualification.**    Before the Company conducts business in any jurisdiction other than Delaware, the Manager shall cause the Company to comply with all

requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Manager, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, or terminate the Company as a foreign limited liability company in all jurisdictions in which the Company may conduct business.

**Section 2.5    Purpose and Scope.** The purposes and scope of the Company's activities are strictly limited to acquiring, developing, constructing and/or renovating, improving, maintaining, owning, leasing, and selling the Project, either individually or through an entity owned by the Company; financing or refinancing the foregoing activities; and performing all other activities reasonably necessary or incidental to the furtherance of such purposes.

**Section 2.6    Term.** The Company shall commence on the effective date of the Certificate and shall be perpetual, unless sooner dissolved as herein provided.

**Section 2.7    No State Law Partnership.** The Company shall not be a partnership or joint venture under any state or federal law, and no Member or Manager shall be a partner or joint venturer of any other Member or Manager for any purposes, other than under the Code (as defined in Section 16.1(d)) and other applicable tax laws, and this Agreement may not be construed otherwise.

## ARTICLE 3
## MEMBERSHIP; DISPOSITIONS OF INTERESTS; REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 3.1    Members.** The initial Members of the Company are the Wachovia Member and the Developer Member, each of which is admitted to the Company as a Member as of the date hereof.

**Section 3.2    *Dispositions of Membership Interests*.**

(a)    **General Restriction.** Except as otherwise provided herein, a Member may not make an assignment, transfer, or other disposition (voluntarily, involuntarily or by operation of law) (a "**Transfer**") of all or any portion of its Membership Interest, nor pledge, mortgage, hypothecate, grant a security interest in, or otherwise encumber (an "**Encumbrance**") all or any portion of its Membership Interest, except with the consent of the other Member (provided, however, such decision, consent or approval shall be made in the sole discretion of the Wachovia Member following the occurrence of a Developer Member Event of Default) or as permitted in Section 3.2(b). Any attempted Transfer of, or granting of an Encumbrance on, all or any portion of a Membership Interest, other than in strict accordance with this Section 3.2, shall be void. Except as permitted in Section 3.2(b), a Person to whom a Membership Interest is Transferred may be admitted to the Company as a member only with the consent of the other Member, which may be given or withheld in the other Member's sole and absolute discretion (provided, however, such decision, consent or approval shall be made in the sole discretion of the Wachovia Member following the occurrence of a Developer Member Event of Default). In connection with any Transfer of a Membership Interest or any portion thereof, and any admission of an assignee as a Member, the Member making such Transfer and the assignee shall

furnish the other Member with such documents regarding the Transfer as the other Member may reasonably request (in form and substance reasonably satisfactory to the other Member), including a copy of the Transfer instrument, a ratification by the assignee of this Agreement (if the assignee is to be admitted as a Member), a legal opinion that the Transfer complies with applicable federal and state securities laws, and a legal opinion that the Transfer will not result in the Company's termination under Section 708 of the Code (as defined in <u>Section 16.1(d)</u>).  No Transfer shall be made directly or indirectly of any interest in the Developer Member without the prior consent of the Wachovia Member, which consent may be granted or withheld in the Wachovia Member's reasonable discretion.  For purposes hereof, a Transfer shall be deemed to have occurred with respect to the Developer Member upon (i) any assignment, transfer, or other disposition (voluntary, involuntary, or by operation of law) of any interest in the Developer Member or (ii) any Transfer of control over any Person (other than an entity which is registered as a public company under the Federal Securities Exchange Act of 1934, as amended) who is directly or indirectly vested with control over the Developer Member; or (iii) any failure of the Principal or Trust to maintain, directly and indirectly, the ownership and voting interests in the Developer Member which exists as of the Effective Date, and the following shall be deemed to be Encumbrances with respect to the Developer Member: (i) any pledge, mortgage, or hypothecation of, or granting of a security interest in, or otherwise encumbering (voluntary, involuntary, or by operation of law) any interest in the Developer Member or (ii) any pledge, mortgage, or hypothecation of, or granting of a security interest in, or otherwise encumbering (voluntary, involuntary, or by operation of law) any interest in any Person (other than an entity which is registered as a public company under the Federal Securities Exchange Act of 1934, as amended) who is directly or indirectly vested with control over the Developer Member.

(b)    **Permitted Transfers**.  The Wachovia Member may Transfer or otherwise grant Encumbrances on all or a portion of its Membership Interest, and ownership interests in the Wachovia Member may be Transferred or encumbered, without the consent of the Developer Member, provided that the Wachovia Member first complies with <u>Section 3.2(c)</u> below. Transfers of interests in the Developer Member to the spouse or any lineal descendant of the owner of such interest, or to a trust for the benefit of any one or more of such individual, spouse or lineal descendant, may be made for estate planning purposes provided that (a) the Principal, or a substitute Person reasonably acceptable to the Wachovia Member, continues to control the Developer Member and own at least a fifty percent (50%) indirect interest in the Developer Member, and (b) such transfer is permitted under the terms of the Loan Documents.

(c)    **Right of First Refusal**.  Prior to a Transfer by the Wachovia Member of any of its Membership Interest, the Developer Member shall have the option to purchase such Membership Interest for a period of 30 days after receipt of written notice from the Wachovia Member of such proposed Transfer, such written notice describing, and any subsequent purchase being, on the same terms and conditions as Wachovia Member proposes to Transfer such Membership Interests.  In the event the Developer Member elects to purchase all, but not less than all, of the Membership Interests proposed to be Transferred by the Wachovia Member, Developer Member shall deliver written notice of its election to the Wachovia Member on or prior to the 30th day after receipt of the written notice from the Wachovia Member of the proposed Transfer.  Upon delivery of such written notice by the Developer Member, the purchase and Transfer of such Membership Interests shall be in accordance with Article 18.  In the event the Developer Member delivers written notice of its election not to purchase such Membership

Interests or fails to deliver written notice to the Wachovia Member within 30 days after receipt of written notice from the Wachovia Member of such proposed Transfer, the Wachovia Member shall be entitled to Transfer the proposed Membership Interests for a period of 60 days without having to comply with this Section 3.2(c) again, provided, such Transfer is on the same terms and conditions as provided for in the initial notice from Wachovia Member of such proposed Transfer of Membership Interests to Developer Member.

**Section 3.3    Creation of Additional Membership Interests.**  Additional Membership Interests may be created and issued to existing Members or to other Persons, and such other Persons may be admitted to the Company as Members, and any new class or group of Members may be created, with the reasonable approval of the Manager and the Wachovia Member, on such terms and conditions, as the Manager and the Wachovia Member may determine at the time of admission (provided, however, such decision, consent or approval shall be made in the sole discretion of the Wachovia Member following the occurrence of a Developer Member Event of Default).   Notwithstanding the foregoing, any sale by Company of Additional Membership Interests shall be in compliance with applicable securities law and prior to the admission of any Member. Member shall execute a joinder to this Agreement.

**Section 3.4    Resignation.**  A Member may not resign or withdraw from the Company without the consent of the other Members.

**Section 3.5    Information.**  In addition to the other rights specifically set forth in this Agreement, each Member and each permitted assignee is entitled to (a) true and full information regarding the status of the business and financial condition of the Company; (b) promptly after becoming available, a copy of the Company's federal, state and local income tax returns for each year; (c) a current list of the name and last known business, residence or mailing address of each Member and Manager; (d) a copy of this Agreement, the Company's certificate of formation, and all amendments to such documents; (e) true and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each Member and which each Member has agreed to contribute in the future, and the date on which each became a Member; and (f) other information regarding the affairs of the Company to which that Member or permitted assignee is entitled pursuant to Section 18-305 of the Act (including all Company books and records).   Under no circumstances shall any information regarding the Company or its business be kept confidential from the Wachovia Member.

**Section 3.6    Liability to Third Parties.**  Except as expressly set forth in this Agreement or in the Loan Documents, no Member or Manager shall be liable for the debts, obligations or liabilities of the Company.

**Section 3.7    Representations and Warranties of Developer Member.**  As a material inducement for the Wachovia Member to contribute its Initial Capital Contribution to the Company, the Developer Member hereby represents and warrants to the Wachovia Member that:

(a)    No Bankruptcy or insolvency proceedings are pending or contemplated by the Developer Member or, to the best knowledge of the Developer Member, against the Developer Member or by or against the Principal;

(b)     All reports, certificates, affidavits, statements and other data furnished by or on behalf of the Developer Member to the Wachovia Member in connection with the Project or this Agreement are true and correct in all material respects and do not omit to state any fact or circumstance necessary to make the statements contained therein not misleading;

(c)     The execution, delivery and performance of this Agreement has been duly authorized by all necessary action to be, and are, binding and enforceable against the Developer Member in accordance with the respective terms thereof and do not contravene, result in a breach of or constitute a default (nor upon the giving of notice or the passage of time or both will same constitute a default) under the operating agreement or other organizational documents of the Developer Member or any contract or agreement of any nature to which the Developer Member is a party or by which the Developer Member or any of its property may be bound and do not violate or contravene any law, order, decree, rule or regulation to which the Developer Member is subject;

(d)     Except as otherwise set forth in any title policy, report or contract provided to and approved by the Wachovia Member, the Project and the current intended use thereof by the Company comply in all material respects with all applicable restrictive covenants, zoning ordinances, subdivision and building codes, flood disaster laws, health and environmental laws and regulations and all other ordinances, orders or requirements issued by any state, federal or municipal authorities having or claiming jurisdiction over the Project. Other than Woodside I and Woodside I which are currently one tax parcel, each Individual Project constitutes one or more separate tax parcels for purposes of ad valorem taxation. Except as otherwise set forth in any title policy, report or contract provided to and approved by the Wachovia Member, the Project does not require any rights over, or restrictions against, other property in order to comply with any of the aforesaid governmental ordinances, orders or requirements;

(e)     All utility services necessary and sufficient for the full use, occupancy, operation and disposition of each Individual Project for its intended purposes are available to such Individual Project, including water, storm sewer, sanitary sewer, gas, electric, cable and telephone facilities, through public rights-of-way or perpetual private easements approved by the Wachovia Member;

(f)     There are no judicial, administrative, mediation or arbitration actions, suits or proceedings pending or threatened against or affecting the Developer Member, the Principal or the Project which, if adversely determined, would materially impair either (i) any Individual Project, or (ii) the Developer Member's ability to perform the covenants or obligations required to be performed under this Agreement;

(g)     The Project is free from delinquent water charges, sewer rents, taxes and assessments;

(h)     As of the date of this Agreement, the Project is free from unrepaired damage caused by fire, flood, accident or other casualty;

(i)     As of the date of this Agreement, no part of the Project or the improvements thereon, if any, has been taken in condemnation, eminent domain or like

proceeding nor is any such proceeding pending or, to the Developer Member's knowledge and belief, threatened or contemplated;

(j)     Except as may otherwise be disclosed in the engineering reports delivered to the Wachovia Member prior to the execution and delivery of this Agreement, any improvements located on the Land are structurally sound, in good repair and free of defects in materials and workmanship and have been constructed and installed in substantial compliance with the plans and specifications relating thereto. All major building systems located within such improvements (as applicable based upon the level of development of each Individual Project), including, without limitation, the heating and air conditioning systems and the electrical and plumbing systems, are in good working order and condition;

(k)     The Developer Member has delivered to the Wachovia Member true, correct and complete copies of all construction, service, management and leasing contracts and agreements (individually or collectively, as the case may require, the "**Contracts**") relating to the Project and all amendments thereto or modifications thereof;

(l)     Each Contract with regard to an Individual Project constitutes the legal, valid and binding obligation of the SPE Owner of such Project and, to the best of the Developer Member's knowledge and belief, is enforceable against any other party thereto. No default exists, or with the passing of time or the giving of notice or both would exist, under any Contract which would, in the aggregate, have a material adverse effect on the Company or the Project;

(m)     No Contract provides any party with the right to obtain a lien or encumbrance upon the Project or any portion of the Project other than mechanics or materialmen's liens arising in the ordinary course of business;

(n)     The Company and the Project are free from any past due obligations for sales and payroll taxes other than taxes not yet due and payable;

(o)     Except as set forth in any title policy, report or contract provided to and approved by the Wachovia Member, there are no security agreements or financing statements affecting all or any portion of the Project other than as disclosed in writing by the Developer Member to the Wachovia Member prior to the date hereof;

(p)     The Developer Member is not a "foreign person" within the meaning of §1445(f)(3) of the Internal Revenue Code of 1986, as amended, and the related Treasury Department regulations, including temporary regulations;

(q)     The easements, covenants, conditions, restrictions and other encumbrances to title to the Project do not and will not materially and adversely affect (i) the ability of the Company to pay in full the Loan in a timely manner (ii) the ability of the Company to pay in full the Preferred Return in a timely manner, or (iii) the intended use or operation of the Individual Project, or the value of the Individual Project;

(r)     Any right of any Affiliate of the Developer Member, or any Affiliate of any of the Developer Member's constituent members, partners, shareholders, employees or principals to receive any compensation, fees or other payments in consideration for its

management services for the Project or its asset management services for the Company shall be and remain subordinate in all respects to the Wachovia Member's rights under this Agreement; provided, however, any right to receive payment for costs and expenses incurred on behalf of the Company shall not be subordinated;

(s)     The Developer Member has not dealt with any financial advisors, brokers, underwriters, placement agents, agents or finder in connection with the subject matter of this Agreement;

(t)     The Project forms no part of any property owned, used or claimed by the Developer Member or the Principal as a residence or business homestead and is not exempt from forced sale under the laws of the State in which the Land is located. The Developer Member hereby disclaims and renounces each and every claim to all or any portion of the Project as a homestead; and

(u)     The Loan is in full force and effect without impairment and without modification, and the Initial Capital Contributions any Additional Capital Contributions required hereunder by the Developer Member, and the transactions contemplated by this Agreement, do not require the consent of the Lender, or if the Lender's consent is required, such consent has been obtained in writing in accordance with the documents evidencing or securing the Loan.

### Section 3.8    Covenants of the Manager and the Developer Member.

(a)     The Manager shall cause the Company to pay when due (i) the principal of and the interest on the Loan in accordance with the terms of the Loan Documents and (ii) the Preferred Return and the Required Redemption Amount in accordance with the terms of this Agreement. The Manager shall also cause the Company to pay all charges, fees and other sums required to be paid by the Company as provided in the Loan Documents, in accordance with the terms of the Loan Documents, and shall cause the Company to observe, perform and discharge all obligations, covenants and agreements to be observed, performed or discharged by the Company set forth in the Loan Documents in accordance with their terms. Further, the Manager shall cause the Company to promptly and strictly perform and comply with all covenants, conditions, obligations and prohibitions required of the Company in connection with any other document or instrument affecting title to the Project, or any part thereof.

(b)     So long as the Wachovia Member is a Member in the Company, the Manager shall (at the Company's sole cost and expense) maintain in effect, until all Loans are fully satisfied, an interest rate cap agreement on terms, and with an institution, acceptable to the Wachovia Member. The Manager shall use the sums payable to the Company under the cap agreement solely for the Company's liabilities and obligations with respect to the Loan and the other Loan Documents, the Preferred Return and the Required Redemption Amount and, with the prior written consent of the Wachovia Member, other expenses directly attributable to the operation of the Project and, upon the satisfaction of all such current liabilities and obligations to Lender and current expenses attributable to the operation of the Project, the balance of such sums shall be disbursed in accordance with the terms of Section 8.1 or 8.2, as applicable. The failure of the Manager to comply with this paragraph shall constitute a misappropriation of funds.

(c)     The Manager shall cause the Company to maintain in force and effect on each Individual Project at all times:

(i)     Insurance against loss or damage to each Individual Project by fire, windstorm, tornado and hail and against loss and damage by such other, further and additional risks as may be now or hereafter embraced by an "all-risk" form of insurance policy.  The amount of such insurance shall be not less than one hundred percent (100%) of the full replacement cost (insurable value) of the improvements (as established by an MAI appraisal), without reduction for depreciation.  The determination of the replacement cost amount shall be adjusted annually to comply with the requirements of the insurer issuing such coverage or, at the Wachovia Member's election, by reference to such indices, appraisals or information as the Wachovia Member determines in its reasonable discretion in order to reflect increased value. Full replacement cost, as used herein, means, with respect to the improvements, the cost of replacing the improvements without regard to deduction for depreciation, exclusive of the cost of excavations, foundations and footings below the lowest basement floor.  The Manager shall also cause the Company to maintain insurance against loss or damage to furniture, furnishings, fixtures, equipment and other items (whether personalty or fixtures) included in each Individual Project and owned by the Company from time to time to the extent applicable.  Each policy shall contain a replacement cost endorsement and either an agreed amount endorsement (to avoid the operation of any co-insurance provisions) or a waiver of any co-insurance provisions, all subject to the Wachovia Member's approval.  The maximum deductible shall be $25,000.00 for each Individual Project.

(ii)     Commercial General Liability Insurance against claims for personal injury, bodily injury, death and property damage occurring on, in or about the Project or the improvements thereon in amounts not less than $4,000,000.00 per occurrence and $5,000,000.00 in the aggregate.  The Wachovia Member hereby retains the right to periodically review the amount of said liability insurance being maintained by the Company and to require an increase in the amount of said liability insurance should the Wachovia Member deem an increase to be reasonably prudent under then existing circumstances.

(iii)     Boiler and machinery insurance is required if steam boilers or other pressure-fired vessels are in operation at an Individual Project, and not otherwise covered under an insurance policy in place under the terms of this Agreement or the Loan Documents. Minimum liability coverage per accident must equal the greater of (i) the replacement cost (insurable value) of the improvements at such Individual Project housing such boiler or pressure-fired machinery, or (ii) $2,000,000.00.  If one or more large HVAC units is in operation at the Individual Project, "Systems Breakdowns" coverage shall be required, as reasonably determined by the Wachovia Member.  Minimum liability coverage per accident must equal the value of such unit(s).

(iv)     If the improvements at an Individual Project or any part thereof is situated in an area designated by the Federal Emergency Management Agency ("FEMA") as a special flood hazard area (Zone A or Zone V), flood insurance in an amount equal to the lesser of: (a) the minimum amount required, under the terms of coverage, to compensate for any damage or loss on a replacement basis (or the unpaid balance of any Loan incurred with respect to an Individual Project if replacement cost coverage is not available for the type of building

insured), or (b) the maximum insurance available under the appropriate National Flood Insurance Administration program. The maximum deductible shall be $3,000.00 per building or a higher minimum amount as required by FEMA or other applicable law.

(v)   During the period of any construction, renovation or alteration of the existing improvements, at the Wachovia Member's request, a completed value, "All Risk" Builder's Risk form or "Course of Construction" insurance policy in non-reporting form, in an amount approved by the Wachovia Member, may be required. During the period of any construction of any addition to the existing improvements, a completed value, "All Risk" Builder's Risk form or "Course of Construction" insurance policy in non-reporting form, in an amount approved by the Wachovia Member, shall be required.

(vi)   When required by applicable law, ordinance or other regulation, worker's compensation and employer's liability insurance covering all persons subject to the worker's compensation laws of the state in which each Individual Project is located.

(vii)   Business income (loss of rents) insurance in amounts sufficient to compensate the Company for all rents or income during a period of not less than eighteen (18) months. The amount of coverage shall be adjusted annually to reflect the rents or income payable during the succeeding twelve (12) month period.

(viii)   At the Wachovia Member's reasonable request, earthquake insurance in an amount approved by the Wachovia Member.

(ix)   Both (a) such other insurance on each Individual Project or on any replacements or substitutions thereof or additions thereto as may from time to time be reasonably required by the Wachovia Member against other insurable hazards or casualties which at the time are commonly insured against in the case of property similarly situated including, without limitation, sinkhole, mine subsidence, earthquake and environmental insurance, due regard being given to the height and type of buildings, their construction, location, use and occupancy and (b) such greater or other insurance on each Individual Project or on any replacements or substitutions thereof or additions thereto as may be required under the terms of the Loan Documents.

All such insurance shall (i) be with insurers fully licensed and authorized to do business in the State within which each Individual Project is located and who have and maintain a rating of at least (A) AA from Standard & Poor's, or equivalent or (B) A-X or higher from A.M. Best, (ii) contain the complete address of the Project (or a complete legal description), (iii) be for terms of at least one year, (iv) be subject to the reasonable approval of the Wachovia Member as to insurance companies, amounts, content, forms of policies, method by which premiums are paid and expiration dates, and (vi) naming EXACTLY:

> Wachovia Development Corporation,
> its Successors and Assigns, ATIMA
> c/o Wachovia Bank, NA, as Servicer
> P.O. Box 391690
> Solon, Ohio 44139-1690

as an additional insured under all insurance policies.

The Manager shall, as of the date hereof, deliver to the Wachovia Member evidence that said insurance policies have been prepaid as required above, unless payment on an insurance policy is made by installments as of the date hereof, and certified copies of such insurance policies and original certificates of insurance signed by an authorized agent of the applicable insurance companies evidencing such insurance satisfactory to the Wachovia Member. The Manager shall renew all such insurance and deliver to the Wachovia Member certificates and policies evidencing such renewals. The Manager further agrees that each such insurance policy: (i) shall provide for at least thirty (30) days' prior written notice to the Wachovia Member prior to any policy cancellation for any reason other than non-payment of premium and at least ten (10) days' prior written notice to the Wachovia Member prior to any cancellation due to non-payment of premium; (ii) shall waive all rights of subrogation against the Wachovia Member; and (iii) in the event that the Project constitutes a legal non-conforming use under applicable building, zoning or land use laws or ordinances, shall include an ordinance or law coverage endorsement with a $1,000,000 combined limit. The blanket policy must properly identify and fully protect the Project as if a separate policy were issued for 100% of Replacement Cost at the time of loss and otherwise meet all of the Wachovia Member's applicable insurance requirements set forth in this Section. Approval of any insurance by the Wachovia Member shall not be a representation of the solvency of any insurer or the sufficiency of any amount of insurance. In the event the Manager fails to provide, maintain, keep in force or deliver and furnish to the Wachovia Member the policies of insurance required by this Agreement or evidence of their renewal as required herein, the Wachovia Member may, but shall not be obligated to, make a Default Contribution to procure such insurance. The Wachovia Member shall not be responsible for nor incur any liability for the insolvency of the insurer or other failure of the insurer to perform, even though the Wachovia Member has caused the insurance to be placed with the insurer after failure of the Manager to furnish such insurance. The Manager shall not obtain insurance for the Project in addition to that required by the terms of this Agreement and the Loan Documents without the prior written consent of the Wachovia Member, which consent will not be unreasonably withheld provided that (i) the Wachovia Member is a named insured on such insurance, (ii) the Wachovia Member receives complete copies of all policies evidencing such insurance, and (iii) such insurance complies with all of the applicable requirements set forth herein.

(d)     The Manager shall cause the Company to pay, except to the extent provision is actually made therefor pursuant to Section 12.1 of this Agreement, all taxes and assessments which are or may become a lien on the Project or which are assessed against or imposed upon the Project. The Manager shall furnish the Wachovia Member with receipts (or if receipts are not immediately available, with copies of canceled checks evidencing payment with receipts to follow promptly after they become available) showing payment of such taxes and assessments at least fifteen (15) days prior to the applicable delinquency date therefor. Notwithstanding the foregoing, the Company may, in good faith, by appropriate proceedings and upon notice to the Wachovia Member, contest the validity, applicability or amount of any asserted tax or assessment so long as (a) such contest is diligently pursued, (b) the Wachovia Member determines, in its subjective opinion, that such contest suspends the obligation to pay the tax and that nonpayment of such tax or assessment will not result in the sale, loss, forfeiture or diminution of the Project or any part thereof or any interest of the Wachovia Member therein, and (c) prior to the earlier of the commencement of such contest or the delinquency date of the

asserted tax or assessment, the Company deposits any required funds to cover taxes or insurance on an Individual Project in a Lender Reserve Account in an amount determined by the Wachovia Member to be adequate to cover the payment of such tax or assessment and a reasonable additional sum to cover possible interest, costs and penalties; provided, however, that the Manager shall promptly cause the Company to pay any amount adjudged by a court of competent jurisdiction to be due, with all interest, costs and penalties thereon, promptly after such judgment becomes final; and provided further that in any event each such contest shall be concluded and the taxes, assessments, interest, costs and penalties shall be paid prior to the date any writ or order is issued under which any Individual Project may be sold, lost or forfeited.

(e)     The Manager shall cause the Company to pay when due all claims and demands of mechanics, materialmen, laborers and others for any work performed or materials delivered for any Individual Project or the improvements thereon; provided, however, that, the Company shall have the right to contest in good faith any such claim or demand, so long as same is permitted under the terms of the Loan Documents, it does so diligently, by appropriate proceedings and provided that neither any Individual Project nor any interest therein would be in any danger of sale, loss or forfeiture as a result of such proceeding or contest. In the event the Company shall contest any such claim or demand, the Manager shall promptly notify the Wachovia Member of such contest and thereafter shall, upon the Wachovia Member's request, promptly cause the Company to provide a bond, cash deposit or other security reasonably satisfactory to the Wachovia Member to protect the Company's interest in any Individual Project should the contest be unsuccessful. If the Manager shall fail to cause the Company to immediately discharge or provide security against any such claim or demand as aforesaid, the Wachovia Member may make a Default Contribution to do so.

(f)     Developer Member hereby represents, warrants and covenants as of the date hereof and until such time as the Wachovia Member no longer owns a Membership Interest in the Company and the Required Redemption Amount has been paid in full, that Developer Member:

(i)     will not, nor will any partner, limited or general, member or shareholder thereof, as applicable, amend, modify or otherwise change its partnership certificate, partnership agreement, articles of incorporation, by laws, operating agreement, articles of organization, or other formation agreement or document, as applicable, in any material term or manner, or in a manner which adversely affects Developer Member's existence as a single purpose entity;

(ii)     will not liquidate or dissolve (or suffer any liquidation or dissolution), or enter into any transaction of merger or consolidation, or acquire by purchase or otherwise all or substantially all the business or assets of, or any stock or other evidence of beneficial ownership of any entity;

(iii)     except as expressly provided in this Agreement or in the Loan Documents, has not and will not guarantee, pledge its assets for the benefit of, or otherwise become liable on or in connection with, any obligation of any other person or entity;

(iv)    does not own and will not own any asset other than its interest in the Company;

(v)    is not engaged and will not engage, either directly or indirectly, in any business other than owning its interest in and managing the affairs of the Company;

(vi)    will not enter into any contract or agreement with any Affiliate except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms length basis with third parties other than an affiliate;

(vii)    has not incurred and will not incur any debt, secured or unsecured, direct or contingent (including, but not limited to, guaranteeing any obligation), other than the obligations incurred under or pursuant to this Agreement, and no other debt will be secured (senior, subordinate or pari passu) by the Developer Member's Membership Interest;

(viii)    has not made and will not make any loans or advances to any third party (including any Affiliate);

(ix)    is and will be solvent and pay its debts from its assets as the same shall become due;

(x)    has done or caused to be done and will do all things necessary to preserve its existence, and will observe all formalities applicable to it;

(xi)    will conduct and operate its business in its own name and as presently conducted and operated;

(xii)    will maintain financial statements, books and records and bank accounts separate from each Affiliate;

(xiii)    will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including, without limitation, any Affiliate);

(xiv)    will file its own tax returns;

(xv)    will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(xvi)    will establish and maintain an office through which its business will be conducted separate and apart from those of its Affiliates and shall allocate fairly and reasonably any overhead and expense for shared office space;

(xvii)    will not commingle the funds and other assets of Developer Member with those of any Affiliate or any other person;

(xviii) has and will maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or any other person;

(xix)   except as expressly provided in this Agreement or in the Loan Documents, does not and will not hold itself out to be responsible for the debts or obligations of any other person;

(xx)   will pay any of its liabilities out of its own funds, including salaries of its employees, not funds of any Affiliate;

(xxi)   will use stationery, invoices, and checks separate from its Affiliates;

(xxii)   will not do any act which would make it impossible to carry on the ordinary business of Developer Member;

(xxiii) will  not sell, encumber or otherwise dispose of all or substantially all of its assets;

(xxiv)  will not hold title to Developer Member's assets other than in Developer Member's name;

(xxv)   will not institute proceedings to be adjudicated bankrupt or insolvent; or consent to the institution of Bankruptcy or insolvency proceedings against it; or file a petition seeking, or consent to, reorganization or relief under any applicable federal or state law relating to Bankruptcy; or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Developer Member or a substantial part of Developer Member's property; or make any assignment for the benefit of creditors; or admit in writing its inability to pay its debts generally as they become due; or take any action in furtherance of any such action; and

(xxvi)  will, to the extent allowed by the Lender and after paying all costs of the Project and after keeping appropriate reserves pursuant to any applicable Operating Budget, Development Budge or as required by any Loan Documents, cause each SPE Owner to make distributions of any excess cash to the extent necessary to pay the Unpaid Preferred Return, the Wachovia Proceeds or the Required Redemption Amount.

**Section 3.9   Covenants of the Trust and Principal.**   The   Principal   hereby covenants that any taxes due on any Individual Project, and any expenses associated with maintaining insurance on any Individual Project, shall be paid by the Principal if not paid by the SPE Owner of the Individual Project pursuant to the Loan Documents. The Trust covenants that it shall, to the extent required by Lender (if Lender's consent is required), and after keeping appropriate reserves pursuant to any applicable Operating Budget, Development Budget or as required by any Loan Documents, cause Developer Member to cause each SPE Owner to make distributions of any excess cash held by such SPE Owner to the extent necessary to pay the Unpaid Preferred Return, the Wachovia Proceeds, or the Required Redemption Amount so that such amounts can be distributed to the Wachovia Member on a timely basis.

## ARTICLE 4
## MANAGEMENT OF COMPANY

### Section 4.1    Management.

(a) The Manager shall manage the affairs of the Company and the development of the Project and make all decisions with regard thereto, except where (1) the Wachovia Member's approval is required under this Agreement or (2) the approval of any of the Members is expressly required by a non-waivable provision of applicable law. Notwithstanding the foregoing, the Wachovia Member shall have sole authority to enforce any agreement between the Company and the Developer Member or its Affiliates and to make all determinations on behalf of the Company with respect thereto.

(b) The Manager shall not have the authority to take any action, make any decision, expend any sum or undertake or suffer any obligation if to do so would constitute a Major Decision without first having obtained the Wachovia Member's prior written consent. Such consent of the Wachovia Member shall be deemed to have been given if such action, decision or expenditure is (i) otherwise expressly permitted under the relevant Loan Documents (other than a refinance of any Loan, or any increase in the amount of any indebtedness with respect to any Loan) or otherwise consented to by the Lender if such consent is required under the relevant Loan Documents or (ii) otherwise expressly authorized by the terms of this Agreement or any approved Operating Budget or Development Budget (provided, the incurrence of any obligation or payment of any amount is not in excess of any amount set forth in such approved Operating Budget or Development Budget, except to the extent such amounts may be adjusted pursuant to this Agreement). As used herein, "**Major Decisions**" means any action or decision:

(1) regarding Company assets, any acquisition, sale, transfer, exchange, mortgage, financing, hypothecation or encumbrance of all or any part thereof, or any lease of any Individual Project not in the ordinary course of business; however, the Manager may make incidental sales, exchanges, conveyances, or transfers of Company personalty or fixtures in the ordinary course of business and except for the sale of an Individual Project where the terms of such sale would result in the Wachovia Member's receipt of an amount equal to the Wachovia Minimum Amount with respect to such Individual Project;

(2) regarding Company financial affairs, (A) determination of major accounting policies, including selection of accounting methods and making various decisions regarding treatment and allocation of transactions for federal and state income, franchise or other tax purposes, (B) determination of all significant tax decisions, including preparation of tax returns, (C) determination of the terms and conditions of all Company borrowings and the identity of the lender thereof, including amending, modifying or otherwise altering the terms and conditions thereof, (D) selection of banks for deposit of Company funds, and the designation of Persons with signatory authority over withdrawal of such funds, and (E) making of any expenditure or incurrence of any obligation by or for the Company; however, if emergency repairs to the Project are necessary to avoid

imminent danger of injury to the Project or to an individual, the Manager may make such expenditures as may be necessary to alleviate such situations and shall promptly notify the Wachovia Member of the event giving rise to such repairs and the actions taken with respect thereto;

(3)     regarding adopting, updating, supplementing, amending or revising, or deviating from, any Development Budget or any Operating Budget;

(4)     regarding Additional Capital Contributions (except to the extent required by Section 6.2 or Section 6.3, or made pursuant to Section 3.3) of this Agreement;

(5)     regarding construction or renovation of any Individual Project, including approval of the Plans, development schedule, budgets, construction draw requests, change orders and all other material matters relating to the acquisition, construction, renovation or refurbishment of any Individual Project (including, without limitation, tenant improvement work); any construction contracts; selection of contractors, architects and engineers; insurance coverages, the underwriters thereof, and claims related thereto; and any variation from or amendment to any of the foregoing;

(6)     regarding lending funds belonging to the Company or extending credit on behalf of the Company to any person, firm or corporation other than trade receivables and accounts receivable arising in the ordinary course;

(7)     regarding granting any concessions by or placing restrictions on the Company or any Individual Project in connection with obtaining zoning, variances, map approval, entitlements, permits or other governmental approvals, and the creation of any title exceptions inconsistent with the Plans as provided to the Wachovia Member as of the date of this Agreement;

(8)     to the extent the Lindbergh Retail Project is not sold, regarding all leases of space in the Lindbergh Retail Project, including approval of the form of lease agreements, guidelines for minimum rental rates, minimum and maximum length of lease terms, brokerage commissions, credit standing of tenants, and the forms of any tenant estoppel certificates and subordination, non-disturbance and attornment agreements; however, entering into leases with tenants in the ordinary course of business in accordance with Section 4.1(f) of this Agreement shall not constitute a Major Decision;

(9)     regarding any Individual Project operations, approval of property manager, leasing agents, management agreements, construction contracts, and brokerage agreements; insurance coverages, the underwriters thereof and claims related thereto; zoning changes, reciprocal operating agreements, cross-easement agreements and similar agreements; annual Operating Budgets, including the amount of reserves for capital improvements, replacements, and purchases, tenant improvements, and leasing commissions; modifications of any of the foregoing;

and all material matters relating to any such Individual Project's compliance with environmental, health, access, and other laws;

(10)    using or referencing in any way the name of, or any affiliation with, the Wachovia Member or any of its Affiliates in any business representation or advertising;

(11)    taking of or settlement of any legal action with an amount in controversy in excess of twenty-five thousand dollars ($25,000), except initiating action to collect rentals and other amounts payable to the Company under leases and other occupancy agreements affecting the Project or to dispossess any occupant who is in default in its obligations to the Company and defending against tenant claims and liability claims for which the Company maintains insurance;

(12)    confessing judgment on behalf of the Company in excess of twenty-five thousand dollars ($25,000);

(13)    making, executing or delivering on behalf of the Company any assignment for the benefit of creditors or any guaranty, indemnity bond or surety bond, or the taking of any action that obligates the Company or any Member as a surety, guarantor or accommodation party;

(14)    filing of any petition or consenting to the filing of any petition that would subject the Company to a Bankruptcy;

(15)    Reserved;

(16)    entering into any agreement with an Affiliate of the Manager, other than those agreements entered into between Affiliates and SPE Owners prior to the date hereof, provided that a copy of any such agreement has been provided to the Wachovia Member prior to the date hereof;

(17)    Reserved;

(18)    engaging in any act of self-dealing by the Manager, including the payment of any compensation or reimbursement to the Manager or its Affiliates or any other person or entity with which the Manager or any of its Affiliates has a significant business relationship;

(19)    Reserved;

(20)    regarding any transaction that is not in the ordinary course of the Company's business or that, considered before the taking thereof, could reasonably be expected to have a material adverse effect on the Company's business or affairs; and

(21)   regarding any current or future Loans, including the terms on which future Loans are to be obtained; provided, however, that the Manager will be permitted to (i) increase the amount of an existing Loan on any Undeveloped Project, or (ii) obtain a new Loan on an Undeveloped Project on substantially similar terms as those provided in Exhibit E with respect to such Undeveloped Project, if the amount of such Loan described in (i) or (ii) of this paragraph does not exceed the Maximum Loan-to-Cost Ratio or Maximum Loan-to-Value Ratio, and the Manager obtains the Wachovia Member's written consent, which consent shall not be unreasonably withheld.

Notwithstanding the foregoing provisions of this Section 4.1(b) or anything in this Agreement to the contrary:

(i)   Solely with respect to the items described in Sections 4.1(b)(2), (4), or (8) above, if the Manager desires to take any of the actions described in Sections 4.1(b)(2), (4), or (8) above, the Wachovia Member shall be deemed to have approved of such action if the Wachovia Member fails to respond to a written request for its approval given in accordance with the notice provisions set forth in Section 19.1 of this Agreement (the "**Approval Request**") within ten (10) business days after receipt by the Wachovia Member of the Approval Request. The Approval Request shall include all information known to the Manager which would be relevant to the Wachovia Member's making the determination of whether to approve such action. In addition, the Approval Request shall state in upper case, bold lettering as follows "**FAILURE TO RESPOND TO THIS NOTICE WITHIN TEN (10) BUSINESS DAYS SHALL BE DEEMED AN APPROVAL UNDER THE OPERATING AGREEMENT.**"

(ii)   As to requests for approval of Major Decisions, other than Approval Requests governed by the provisions of Section 4.1(b)(i) above, each Member agrees that its response to any such request for approval shall not be unreasonably withheld or delayed.

Upon the occurrence of a Developer Member Event of Default, the Wachovia Member shall have the authority to unilaterally make and/or effect all Major Decisions in its sole discretion.

(c)   Except as otherwise expressly provided in this Section 4.1, the Manager shall have the authority to execute a contract on behalf of the Company provided that (1) such contract is a normal and customary contract in the operation of any Individual Project anticipated by the applicable Development Budget or Operating Budget, and the other provisions of this Agreement and is with an unaffiliated third party; (2) the expenditures to be made pursuant to such contract are consistent with the applicable Development Budget or Operating Budget; (3) such contract may be terminated without penalty by the Company without cause on not more than 30 days' prior written notice; and (4) such contract does not obligate the Company to make payments in any year in excess of $50,000 with respect to the applicable Individual Project.

(d)     Except as otherwise expressly provided in this Agreement, without the prior consent of all Members, no Member shall have any authority to do any Prohibited Act and any attempted doing of any Prohibited Act without the consent of all Members shall be null and void.

(e)     The Manager shall discharge its duties in a good and proper manner as provided for in this Agreement. The Manager, on behalf of the Company, shall in good faith use all commercially reasonable efforts to implement all Major Decisions approved by the Manager and the Wachovia Member, enforce agreements entered into by the Company, and conduct the ordinary business and affairs of the Company in accordance with good industry practice and this Agreement. The Manager shall not be required to devote a particular amount of time to the Company's business, but shall devote sufficient time to perform its duties hereunder. The Manager shall not delegate any of its rights or powers to manage and control the business and affairs of the Company without the prior consent of the Wachovia Member.

(f)     The Developer Member and the Wachovia Member shall agree to the minimum initial rental rates and all material terms and conditions upon which space in any Individual Project shall be offered for lease prior to the lease of any such space (the "**Leasing Parameters**"). The Developer Member agrees that (i) it shall only lease space in any Individual Project once the Leasing Parameters for such Individual Project have been determined in accordance with the immediately preceding sentence, and (ii) it shall use leases in substantially the same form attached hereto as Exhibit F. So long as (A) no Developer Member Event of Default has occurred, (B) all leasing activities comply in all material respects with the Leasing Parameters (if any have been established), and (C) all leases are in the form of the form leases attached hereto as Exhibit F, and do not otherwise create material liabilities or obligations on the part of the Company not otherwise approved, the Wachovia Member agrees not to unreasonably withhold its consent to such leasing activities.

### Section 4.2    Construction.

(a)     **Construction of Project**.  Promptly following the Closing Date, the Manager shall cause the Company to perform certain capital improvements and other work to develop, improve and/or renovate each Individual Project, with the exception of the Woodside II Project, in accordance with this Section 4.2 (collectively, the "**Construction**"). The general scope of the Construction is described in the Plans and the Development Budget. The Manager shall use commercially reasonable efforts to cause the Company to complete the Construction in accordance with this Section 4.2 by utilizing any amounts placed into a Lender Reserve Account plus, if applicable, advances made under the Loan for such purpose (the "**Construction Advances**") in accordance with the following provisions of this Section 4.2.

(b)     **Development Budget and Completion Schedule**. The development budget (the "**Development Budget**") attached hereto as Exhibit B and the Plans provided to the Wachovia Member have been prepared by the Manager and approved by the Wachovia Member and describe in detail the Construction Work (as defined below) to be performed and the estimated cost thereof, and includes a completion schedule (the "**Completion Schedule**") showing the timing of the completion of various aspects of such work.

(i)     The Development Budget and the Completion Schedule may be amended from time to time only with the prior consent of the Manager and the Wachovia Member, which consent shall not be unreasonably withheld (and, if required by the Loan Documents, the Lender); provided, however, that the Wachovia Member may withhold consent in its sole and absolute discretion to any amendment which increases the total cost of the Construction or extends any scheduled Completion Date for any matter within the reasonable control of the Manager.

(ii)     Any expenditure required to implement the Construction as shown on the Development Budget is herein called a "**Construction Expenditure**".

(iii)     The work and expenditures required to finish the Construction and allow it to be utilized by the Company in accordance with the Development Budget are herein collectively referred to as the "**Construction Work**".

(c)     **Performance of Construction Work**.   The Manager shall cause the Company to perform the Construction Work in accordance with the following requirements:

(i)     If appropriate, as reasonably determined by the Wachovia Member, the Manager shall cause detailed Plans for the Construction Work, or such portions thereof as may be specified by the Wachovia Member, to be prepared by a qualified architect reasonably satisfactory to the Wachovia Member.

(ii)     All Construction Work shall be done in a good and workmanlike manner and substantially in accordance with the Plans (if any) that have previously been approved by the Wachovia Member.  The Manager shall cause the Company to make expenditures consistent with the Development Budget and to enter into contracts consistent with the Development Budget, subject, however, to the terms of Section 4.1(b).  To the extent expressly provided in the applicable Loan Documents, or otherwise consented to by the Lender, the Manager shall be permitted to reallocate Cost Savings realized in any line item of the Development Budget (other than Cost Savings in the line item for any Lender Reserve Account to pay for interest expense) to other line items provided.   In all other circumstances, however, unless the prior consent of the Wachovia Member is obtained, the Manager shall not reallocate Cost Savings by more than the lesser of 5% in excess of the amount set forth in any particular line item in the Development Budget or $10,000 in excess of the amount set forth in such line item. If the Manager believes that it will be necessary to expend more than is permitted by the preceding sentence in completing the Construction Work, the Manager will promptly inform the Wachovia Member of such anticipated Cost Overrun, and shall follow the Wachovia Member's directions with respect thereto, including causing such Cost Overrun to be funded in accordance with Section 6.2.

(iii)     Subject to Force Majeure, the Manager shall use commercially reasonable efforts to cause the Construction Work to be completed in accordance

with the Completion Schedule and the Manager shall use commercially reasonable efforts to cause Substantial Completion of the Project to be achieved by the Completion Date.

(iv)     The Manager shall ensure that all of the Construction Work shall be done in compliance with the applicable provisions, covenants and conditions of the Loan Documents and the applicable requirements of all applicable laws, as well as all real property restrictions and contractual obligations to which the Company may be subject.

(v)     The Manager shall cause the Company or the general contractor to obtain all licenses and permits, including building permits and certificates of occupancy, if applicable, required to be obtained in connection with the performance of the Construction Work by any applicable laws pertaining to the Construction Work, or by any governmental authorities having jurisdiction over the Construction Work (with such licenses and permits to be obtained as, if and when required by such applicable laws or such governmental entities). The Manager shall (a) cause the Company to satisfy all conditions shown on any temporary certificates of occupancy issued in connection with the Construction Work, (b) cause each such temporary certificate of occupancy to be renewed until a final and unqualified certificate of occupancy is issued in replacement thereof, and (c) cause to be delivered to the Company (as, if and when required by any laws) final, unqualified and unconditional certificates of occupancy pertaining to the Construction Work.

(vi)     The Manager shall, at the expense of the Company, cause the Construction Work to be performed on a lien-free basis, and, in the event of the filing of a mechanic's or materialman's lien or liens with respect thereto, shall cause the same to be immediately discharged or bonded over at the expense of the Company; subject, however, to the right of the Manager, acting on behalf of the Company, to dispute a claim in good faith, so long as the continuation of such dispute does not constitute a violation of the Loan Documents or permit enforcement of any lien against the Project or any portion thereof. In the event of any such dispute in excess of $10,000, the Manager shall promptly notify the Wachovia Member, and if the Wachovia Member elects to participate in resolution of such dispute, the Manager and the Wachovia Member shall jointly approve all matters of a material nature related to resolution thereof.

(d)     **Fees**. The Manager shall not be entitled to any fees in connection with its oversight and performance of the Construction Work except as provided in the Joint Development Agreement described in Section 4.9, or as provided under any Loan Documents to be currently paid to the Manager.

(e)     **Funding Procedure**.

(i)     The Construction Work shall be funded by advances from a Lender Reserve Account established for such purpose (a "**Renovation Reserve**"), if any,

and by Construction Advances, if applicable. In that connection, as and when required for the performance of the Construction Work, but not more frequently than monthly, the Manager shall prepare and submit to the Wachovia Member no later than simultaneously with the Lender, a request for a release of funds from the Renovation Reserve and/or a request for a Construction Advance under the Loan Documents, if applicable (each, a "**Requisition**") which shall:

        (A)    set forth the amounts and purposes for which the amount requested (the "**Requisition Amount**") is to be utilized,

        (B)    set forth a certification from the Manager that all sums included in the Requisition Amount are due and payable for work and/or services performed and that such amount is to be utilized solely to pay Construction Expenditures in compliance with the Development Budget (taking into account the flexibility provided to the Manager to deviate from the Development Budget to the extent herein expressly permitted),

        (C)    contain a reconciliation with the Development Budget in form reasonably satisfactory to the Wachovia Member showing all amounts spent on Construction Expenditures through the date of the Requisition,

        (D)    set forth a certification from the Manager that no Developer Member Event of Default exists, and

        (E)    contain such other information as may be reasonably requested by the Wachovia Member.

        (ii)    The Wachovia Member shall have the right to approve each Requisition in its reasonable discretion subject to paragraph (vii) of this Section 4.2(e), and the Wachovia Member shall use commercially reasonable efforts to approve or reject a Requisition (or request additional information regarding such Requisition) within three (3) business days after its receipt of the same. If the Wachovia Member does not approve or reject a Requisition within three (3) business days after its receipt of such Requisition, the Wachovia Member will be deemed to have approved such Requisition. Upon the approval of a Requisition by the Wachovia Member and the Lender, if applicable, the Requisition Amount shall be funded or transferred from the Renovation Reserve and from a Construction Advance, as applicable, into a separate Company bank account (the "**Payment Account**"), and the Manager shall withdraw funds from such Payment Account to pay Construction Expenditures in accordance with such Requisition and the other provisions of this Agreement.

        (iii)    Except for the first Requisition, concurrently with the delivery of each Requisition to the Wachovia Member, the Manager shall provide to the Wachovia Member (or cause the Property Manager to provide to the Wachovia Member) a statement (a "**Reconciliation Statement**"), which shall:

(A)   detail how the prior month's Requisition Amount was utilized,

(B)   reconcile such usage with the prior Requisition, and

(C)   set forth an explanation of any material variances (which provision, however, shall not be construed as a waiver of the requirement that each Requisition Amount shall be utilized in conformity with the applicable Requisition).

(iv)   The Reconciliation Statement shall be certified as accurate by an officer of the Manager. If any portion of the prior Requisition Amount has not yet been expended as of the date of the Reconciliation Statement, the Reconciliation Statement shall so state and provide an explanation therefor, and the Requisition accompanying the Reconciliation Statement shall take into account such unused prior Requisition Amount.

(v)   If the Manager withdraws funds from the Payment Account except in accordance with a Requisition approved by the Wachovia Member, or fails to use any amounts so withdrawn in conformity with the applicable Requisition (excluding from the foregoing, however, any cost savings or immaterial variations), then, without limitation on the Wachovia Member's and the Company's other rights and remedies, the Wachovia Member may thereafter require that all checks or other withdrawals on the Payment Account must be counter-signed by a designated representative of the Wachovia Member, and the procedure set forth in this Section 4.2(e) pertaining to funding the Requisition Amount into the Payment Account may, at the option of the Wachovia Member, be discontinued (in which event, thereafter all checks for Construction Expenditures shall be signed by the Wachovia Member).

(vi)   If requested by the Wachovia Member, the Reconciliation Statements shall be accompanied by receipts, canceled checks or other evidence reasonably satisfactory to the Wachovia Member showing the actual utilization of the prior Requisition Amount.

(vii)   The decision whether or not to approve any Requisition shall be made by the Wachovia Member in its reasonable discretion; provided, however, if such Requisition is consistent with the Development Budget and the Plans previously approved by the Wachovia Member, and such Requisition has been approved by the applicable Lender, if necessary, such Requisition shall be deemed approved by the Wachovia Member. Without limitation, the Wachovia Member may condition its approval of any Requisition on the non-existence of any Developer Member Event of Default.

(f)   **Reports**.  On a monthly basis (and to the extent not already covered by the Requisition and Reconciliation Statements prepared by the Manager on a monthly basis), the Manager shall prepare and deliver to the Wachovia Member a report showing the progress of

construction of the Construction Work, listing all expenditures made to date on a cumulative basis, and reconciling such expenditures with the Development Budget, with each such report to be delivered not later than the 20th day of the following calendar month. In addition, and without limitation on the Manager's duties under Article 5 hereof, the Manager shall prepare and deliver to the Wachovia Member such other reports and information pertaining to the Construction Work as the Wachovia Member may reasonably request from time to time (but not more often than monthly, absent the occurrence of some unexpected event which has or may have a material adverse impact on the progress of the Construction Work), and such reports and information as may be required under the Loan Documents with respect to the performance of the Construction Work.

(g)     **Development Consultant**.  The Wachovia Member reserves the right to retain a development, architectural and/or engineering consultant (collectively, the "**Development Consultant**"), at the Company's expense (provided such expense does not exceed $1,000 per month per Individual Project), as the Wachovia Member's consultant in connection with the Construction and the administration of all Requisitions in order to advise the Wachovia Member in connection with the progress of the Construction Work and all approvals requested of the Wachovia Member under this Agreement (including the Major Decisions as defined below). If a Development Consultant is retained, the Manager shall furnish such Development Consultant with copies of all information, reports, documents, notices and other materials required to be provided to the Wachovia Member or the Company under this Agreement or the Development Agreement, at the same time as the same are furnished to the Wachovia Member or the Company.

Section 4.3     **Operating Budgets and Expenditures**.

(a)     **Implementation of Operating Budgets**.  The Manager, or the Property Manager under the supervision of the Manager, shall prepare and deliver to the Wachovia Member for its approval budgets for the operation of each Individual Project, prepared on a modified cash basis, which budgets shall be delivered not later than forty-five (45) days prior to the commencement of a particular calendar year (except that the budget for the calendar year in which the Closing Date occurs shall be delivered prior to the Closing Date). The Manager shall not implement any budget unless the same has been approved in writing by the Wachovia Member, whereupon the same shall be deemed the "Operating Budget" for the Project.  The Manager shall implement each Operating Budget and the Manager shall be authorized, without the need for further approval by the Wachovia Member, to make the specified expenditures and incur the specified obligations provided for in such Operating Budget (but only if the Manager acts in strict conformance with such Operating Budget in all respects with regard to, among other matters, the nature and amount of each such expenditure or obligation, and the other provisions of this Agreement). All of the Operating Budgets for the balance of the current calendar year are attached hereto as Exhibit G and such Operating Budgets are hereby approved by the Wachovia Member.

(b)     **Deviation from Operating Budgets**.  In implementing any Individual Operating Budget, and unless the consent of the Wachovia Member is first obtained, the Manager shall not cause or permit the Company to expend more than the lesser of 105% or $10,000 in excess of the total amount designated for any line item in such Individual Operating

Budget without the prior consent of the Wachovia Member. The Manager shall promptly notify the Wachovia Member in writing if the Manager concludes that compliance with its obligations under this Agreement would necessitate the expenditure of sums that are not permitted by the foregoing sentence.

(c)      **Failure to Approve Operating Budgets**.  If any proposed Operating Budget for any calendar year has not been approved by January 1 of that year, the Manager shall continue to operate under the Operating Budget for the previous year with such adjustments as may be necessary to reflect deletion of non-recurring expense items set forth in the previous Operating Budget and increased insurance costs, taxes, utility costs, and debt service payments; however, no capital expenditures (other than deposits into a Lender Reserve Account) shall be made for that year until an Operating Budget for such year is approved by the Wachovia Member.

(d)      **Sources and Uses Statements**.  The sources and uses of the funds for each Individual Project is as set forth on Exhibit H attached hereto.

### Section 4.4     Meetings of Members.

(a)      **Regular Meetings**.  The Members shall hold annual meetings after the Manager submits an Operating Budget to the Wachovia Member for its review, to discuss the Project, and to discuss such other matters regarding Company business as the Members may elect.

(b)      **Special Meetings**.  Special meetings of the Members may be called by the Manager, the Developer Member or the Wachovia Member at any time by delivering at least two (2) business days' prior notice thereof to the other Members to discuss such matters regarding Company business as the Members may elect.

(c)      **Procedure**.  Each Company meeting shall be held at the principal place of business of the Company, unless the Members otherwise agree.  Attendance of a Person at a meeting shall constitute a waiver of notice of such meeting, unless such Person attends the meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.  As to any matter requiring a vote of Members, the Members' relative voting power shall be based upon the Members' respective Capital Sharing Ratio; however, this provision shall not be interpreted to substitute a vote of Members for any approval or consent by any Member expressly required by this Agreement.  A Person may vote at such meeting by written proxy executed by that Person and delivered to a Manager or Member.  A proxy shall be revocable unless it is stated to be irrevocable.  Any action required or permitted to be taken at such meeting may be taken without a meeting, without prior notice, and without a vote if a consent or consents in writing, setting forth the action so taken, is signed by the Manager and the Members that would be necessary to take the action at a meeting at which all Members were present and voted.  Any meeting may take place by means of telephone conference, video conference, or similar communication equipment by means of which all Persons participating therein can hear each other.

**Section 4.5**   **Officers**.  The Manager, with the consent of the Wachovia Member, may designate one or more Persons to be officers of the Company ("**Officers**"), and any Officer so designated shall have such title, authorities, duties, and salaries as the Manager, with the Wachovia Member's approval, may delegate to them.  Any Officer may be removed as such, either with or without cause, by the Manager, with the approval of the Wachovia Member.

**Section 4.6**   **Reimbursement of Expenses**.  The Manager shall be reimbursed for all reasonable out-of-pocket expenses actually incurred by it directly in connection with the business and affairs of the Company (including travel and entertainment expenses, telephone costs, and the like, but not overhead expenses), to the extent set forth on an Operating Budget or as otherwise approved in writing by the Wachovia Member.  Additionally, the Wachovia Member shall be reimbursed for its reasonable out-of-pocket expenditures incurred for an annual site inspection of the Project and for its inspections occurring after a Developer Member Event of Default or other event which in the reasonable discretion of the Wachovia Member, materially affects any Individual Project or the Company.  Upon request, a Member shall provide reasonable supporting verification to the other Members for all expenditures for which any reimbursement is requested.

**Section 4.7**   **Compensation of Members**.  Except as herein otherwise specifically provided, no compensatory payment shall be made by the Company to any Member for the services to the Company of such Member or any member or employee of such Member.

**Section 4.8**   **Transactions with Affiliates**.

(a)   **General**.  When any service or activity to be performed on behalf of the Company is performed by an Affiliate of a Member, a written contract shall be entered into and the fee payable for such service or activity shall not exceed the fee which would be payable by the Company to an unaffiliated third party of comparable standing providing the same services. In addition, the non-Affiliate Member shall have full power and authority to approve all terms and conditions of the written contract and enforce the provisions thereof for the benefit of the Company, including terminating the contract if a default occurs thereunder and otherwise pursuing all other available remedies.

(b)   **Termination of Agreements with Affiliates**.  In the event of any Developer Member Event of Default, the Company may terminate all agreements with the Developer Member's Affiliates, and all such agreements shall contain a provision that allows for the exercise of the right of termination under this Section 4.8(b).  The Wachovia Member may enforce this provision on behalf of the Company.

**Section 4.9**   **Development Matters**.   In conjunction with the execution of this Agreement, the Developer Member and the Wachovia Member shall enter into a Joint Development Agreement in the form attached hereto as Exhibit C, specifying the parties' respective roles with respect to the construction or renovation of all improvements related to the Project in form and substance satisfactory to the Wachovia Member.

**Section 4.10**   **Indemnification; Reimbursement of Expenses; Insurance**.   To the fullest extent permitted by the Act: (a) the Company shall indemnify each Manager and Member

(including any officers, employees and agents) who was, is or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding (a "**Proceeding**"), any appeal therein, or any inquiry or investigation preliminary thereto, solely by reason of the fact that said Person is or was a Manager or Member and was acting within scope of its authorized duties or under the authority of the Members and (b) the Company shall pay or reimburse a Manager or Member for expenses incurred by said Person (1) in advance of the final disposition of a Proceeding to which such Manager or Member  was, is or is threatened to be made a party, and (2) in connection with said Person's appearance as a witness or other participation in any Proceeding.  The Company, by adoption of a resolution of the Members, may indemnify and advance expenses to an Officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Managers and Members under the preceding sentence.  The provisions of this Section 4.10 shall not be exclusive of any other right under any law, provision of the Certificate or this Agreement, or otherwise. Notwithstanding the foregoing, this indemnity shall not apply to actions constituting gross negligence, willful misconduct or bad faith, or involving a breach of this Agreement, but shall apply to actions constituting simple negligence.  The Company may purchase and maintain insurance to protect itself and any Manager or Member, Officer, employee or agent of the Company, whether or not the Company would have the power to indemnify such Person under this Section 4.10.  Except to the extent otherwise expressly provided for in this Agreement, this indemnification obligation shall be limited to the assets of the Company and no Member shall be required to make a Capital Contribution in respect thereof.

Section 4.11  **Conflicts of Interest.**   Subject to the other express provisions of this Agreement, each Member, Manager, Officer or Affiliate thereof may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Member, Manager or Officer the right to participate therein or to account therefore. The Company may transact business with any Member, Manager, Officer or Affiliate thereof with the prior written consent of the Wachovia Member and provided that the terms of those transactions are no less favorable to the Company than those the Company could obtain from unrelated third parties.

### ARTICLE 5
### ACCOUNTING AND REPORTING; BUSINESS PLAN

Section 5.1    **Fiscal Year, Accounts, Reports.**

(a)    The fiscal year of the Company shall be the calendar year.

(b)    The Manager shall cause to be kept proper and complete records and books of account in which shall be entered fully and accurately all transactions and other matters relating to the Company's business as are usually entered into such records and books of account kept for businesses of a like character. The Company's records and books shall be kept on a modified cash basis, along with books and records which will enable the Company to convert to an accrual basis method of accounting in accordance with generally accepted accounting principles, consistently applied ("**GAAP**"), except as may otherwise be approved by the Wachovia Member.  Notwithstanding Section 18-305(c) of the Act, the Manager shall not have

the right to keep confidential from any Member any information relating to the Company, the Project or a Member's interest in the Company.

(c)     The Manager shall provide to the Wachovia Member, in addition to any other financial statements required hereunder or under any of the other Loan Documents, the following financial statements and information, all of which must be certified to the Wachovia Member as being true and correct by the Manager or the person or entity to which they pertain, as applicable, and, with respect to the financial statements and information set forth in subsection (iii) hereof:

(i)     copies of all tax returns filed by the Manager on behalf of the Company, within thirty (30) days after the date of filing;

(ii)     monthly operating statements for each Individual Project, within twenty (20) days after the end of each month following the date hereof, which shall show monthly activity and year-to-date activity and state Operating Revenues, Operating Expenses, Net Operating Income, Adjusted Net Cash Flow and Net Cash Flow for the month then just ended, a balance sheet for each Individual Project, an updated rent roll, a copy of every Lease (provided that the Company shall only be required to provide copies of commercial Leases and shall make available to the Wachovia Member copies of all other Leases) executed during such month and, as requested by the Wachovia Member, a written statement setting forth any variance from the Operating Budget;

(iii)     annual operating statements and balance sheets for each Individual Project, within ninety (90) days after the end of each calendar year, which shall show Operating Revenues, Operating Expenses, Net Operating Income, Adjusted Net Cash Flow and Net Cash Flow for each Individual Project, a statement of the Members' Capital Accounts, applicable Balances and a statement setting forth the Profits and Losses of the Company for such fiscal year and, if required by the Wachovia Member, prepared on a review basis and certified by an independent public accountant satisfactory to the Wachovia Member; and

(iv)     such other information with respect to the Project, the Manager, the principals or general partners or managing members in the Manager which may be reasonably requested from time to time by the Wachovia Member, within a reasonable time after the applicable request.

If any of the aforementioned materials are not furnished to the Wachovia Member within the applicable time periods or the Wachovia Member is dissatisfied with the contents of any of the foregoing and has notified the Manager of its dissatisfaction, in addition to any other rights and remedies of the Wachovia Member contained herein, the Wachovia Member shall have the right, but not the obligation, to obtain the same by means of an audit by an independent certified public accountant selected by the Wachovia Member, in which event the Manager agrees to pay, or to reimburse the Wachovia Member for, any expense of such audit and further agrees to provide all necessary information to said accountant and to otherwise cooperate in the making of such audit. The obligation to pay for such audit, or to reimburse the Wachovia Member for the expense of such audit, shall apply to only one audit per year, unless an Event of Default has occurred and is continuing, in which case the Wachovia Member must pay for such audit, or reimburse the

Wachovia Member for the expense of such audit, for each audit requested by the Wachovia Member.

   (d) Each Member, at its expense, may at all reasonable times during usual business hours audit, examine, and make copies of or extracts from the books of account records, files, and bank statements of the Company. Such right may be exercised by any Member, or by its designated agents or employees.

  **Section 5.2** **Bank Accounts**. The Manager shall open and maintain (in the name of the Company) a special bank account or accounts in a bank or savings and loan association, the deposits of which are insured, up to the applicable limits, by an agency of the United States government, in which shall be deposited all funds of the Company. Withdrawals therefrom shall be made upon the signatures of such Persons as the Manager shall designate with the approval of the Wachovia Member.

  **Section 5.3** **Financial Accounting Matters Member**. The Developer Member shall be the Financial Accounting Matters Member, and, notwithstanding anything to the contrary provided in Section 4.1(b), shall have sole responsibility for the following:

   (a) Selection from among sound accounting principles for the purpose of usage in the Company's financial statements prepared in conformity with sound accounting principles as described under this Section 5.3 (including, but not limited to the allocation of all revenues and expenses, including depreciation, to the respective Member's Capital accounts), and

   (b) Selection of a nationally recognized independent firm of certified public accountants as described under this Article 5.

  **Section 5.4** **Business Plan**. The Members shall establish a business plan (the "**Business Plan**"), setting forth objectives, strategy, operating budgets and capital improvement plans and budgets (if applicable) relating to the operation and construction of each Individual Project. All budgets pertaining to the construction of each Individual Project shall be subject to review by the Development Consultant, selected and paid for in accordance with Section 4.2(g), if the Wachovia Member so elects. The Business Plan shall also set forth leverage limitations, anticipated holding period, anticipated terms of any sale of an Individual Project, anticipated net effective rental rate and projected occupancy of such Individual Project, and other essential elements of the Company's operation. The Business Plan, and all amendments or modifications thereto, shall be subject to the Wachovia Member's prior approval. A draft of the initial Business Plan will be delivered by the Manager to the Wachovia Member prior to the Closing Date. The Business Plan shall be updated by the Manager semi-annually, or more frequently as the Members may decide is appropriate, or if the Lender requests. Nothing in the Business Plan shall be deemed a waiver or modification of any Member's rights under this Agreement, including Article 10, even if a sale is not in compliance with the Business Plan.

### ARTICLE 6
### CAPITAL CONTRIBUTIONS

  **Section 6.1** **Initial Capital Contributions**. The Members shall make their respective Initial Capital Contributions to the Company on or before the Closing Date.